**PACIFIC NATURAL GAS CO., a corporation, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**No. 16498.**

United States Court of Appeals
Ninth Circuit.

March 14, 1960.

Preston, Thorgrimson & Horowitz, Seattle, Wash., Metzger, Blair & Gardner, A. E. Blair, Tacoma, Wash., for petitioner.

Brobeck, Phleger & Harrison, Gregory A. Harrison, Malcolm T. Dungan, San Francisco, Cal., Leon M. Payne, Andrews, Kurth, Campbell & Bradley, Houston, Tex., Richard Gray, Houston, Tex., for intervener, Pacific Northwest Pipeline Corp.

Willard W. Gatchell, Gen. Counsel, Howard E. Wahrenbrock, Sol., W. Russell Gorman, Asst. Gen. Counsel, Leo Forquer, Peter H. Schiff, Attys., Federal Power Commission, Washington, D. C., for respondent.

Before MAGRUDER, HAMLIN and KOELSCH, Circuit Judges.

MAGRUDER, Circuit Judge.

Petitioner, Pacific Natural Gas Company, is a distributor in the State of Washington of natural gas which it purchases from Pacific Northwest Pipeline Corporation. 98.6 per cent of its requirements consists of "industrial gas", that is, gas purchased for resale for industrial use only. The Natural Gas Act provides that all rates and charges by any natural gas company in connection with the transportation or sale of natural gas subject to the jurisdiction of the Federal Power Commission shall be "just and reasonable"; otherwise the charges are declared to be unlawful. 15 U.S.C.A. § 717c(a). Section 717c(c) provides that under such rules and regulations as the Commission may prescribe, any natural gas company shall file schedules showing all rates and charges for any transportation or sale subject to Commission jurisdiction, together with all contracts which in any manner affect or relate to such rates. Section 717c(e) provides that whenever any such new schedule is filed, the Commission shall have authority upon its own initiative to enter upon a hearing concerning the lawfulness of such rates appearing in the schedule.

The Natural Gas Act also provides for important differences between the powers of the Federal Power Commission with regard to industrial gas, on the one hand, and nonindustrial gas, on the other. Thus the Commission is given discretionary authority to suspend the operation of any new rate for a period not in excess of five months, provided it is not a rate for the sale of natural gas for resale for industrial use only. It is further provided that if such hearing by the Commission is not concluded by the expiration of the suspension period, the proposed new rate shall go into effect forthwith, but the Commission is given authority in that event to require the natural gas company to furnish a bond to refund any amounts which ultimately may be ordered by the Commission.

The present proceeding was commenced on August 6, 1957, when Pacific Northwest Pipeline Corp. filed its schedules with the Commission covering a general increase in rates. Accompanying the new tariff schedules, as required by law, were copies of service agreements with various purchasers, including Pacific Natural Gas Co.

This filing was docketed by the Commission under No. G–13202. By order entered September 4, 1957, the Commission suspended for five months the effective application of the new rates, as applied to all sales by Pacific Northwest Pipeline Corp. except of course sales of industrial gas. In support of its order, the Commission recited that the "increased rates and charges provided in said tariff sheets, as tendered on August 6, 1957, have not been shown to be justified, and may be unjust, unreasonable, unduly discriminatory, or preferential, or otherwise unlawful."

Petitioner Pacific Natural Gas Co. was granted leave to intervene in the administrative proceeding, and on January 17, 1958, moved that the Commission enter an order rejecting the filing of the new rates to the extent that the schedules filed purported to apply to natural gas purchased by petitioner. This motion having been denied by order issued February 25, 1959, and a motion for rehearing having also been denied, there was duly filed in this court on June 12, 1959, the pending petition for review of the Commission's order of February 25, 1959.

Article III of petitioner's service agreement read as follows:

"Buyer agrees to pay Seller for all natural gas service rendered under the terms of this Agreement in accordance with Seller's Rate Schedule I–1 as filed with the Federal Power Commission, and as such rate schedule may be amended or superseded from time to time. This Agreement shall be subject to the provisions of such rate schedule and the General Terms and Conditions applicable thereto on file with the Federal Power Commission and effective

from time to time, which by this reference are incorporated herein and made a part hereof."

One of the General Terms and Conditions contained in the tariff schedule filed by Pacific Northwest Pipeline Corp., thus incorporated by reference into the agreement, is the following:

"Seller's rates, charges, classifications and services as set forth in this Tariff are subject to regulation by the Federal Power Commission under the Natural Gas Act. Seller shall have the right to file from time to time with the Federal Power Commission under Section 4 of the Natural Gas Act such new rate schedules and changes in its existing effective Tariff as Seller may find necessary from time to time to assure Seller just and reasonable rates and charges as well as a rate sufficient to service the Seller's debt, attract capital, insure expansion and provide adequate natural gas service to all Seller's customers. Without in any way limiting the generality of the foregoing, Seller .shall have the right to file new rate schedules fairly and appropriately reflecting changes in the rates and charges paid by Seller for natural gas. *Buyer shall have the right to protest any such new rate schedules and changes before the Federal Power Commission.*" [Italics added.]

■ Preliminarily we reject one argument of a procedural nature, advanced by Pacific Northwest Pipeline Corp. as intervenor in the present review proceedings, to the effect that the petitioner, Pacific Natural Gas Co., has no standing to challenge the constitutional validity of the Commission's order. It seems to us pretty clear that if the Commission had had power to do so, it would have suspended the application of all new rates filed by the supplier, including rates applicable to industrial gas. Since the Commission by the provision of § 717c(e) did not have power to do this, it only applied the five-month suspension to rates applicable to sales of nonindustrial gas.

Thus, regardless of whether the new rates for both industrial and nonindustrial gas are ultimately found reasonable or unreasonable, Pacific Natural Gas Co., as a purchaser of industrial gas, will have suffered a financial detriment in that, unlike the purchasers of nonindustrial gas, it will have obtained no benefit from the five-month suspension provision. The record contains no evidence sustaining the suggestion that, even if petitioner was financially injured in the first instance by the Commission's inability to suspend new rates for industrial gas, the burden was passed on to those buyers to whom Pacific Natural Gas Co. distributed the gas it bought from Pacific Northwest Pipeline Corp. Certainly we cannot say that any other person is in a better position than petitioner to maintain the constitutional claim. Cf. Columbia Broadcasting System, Inc. v. United States, 1942, 316 U.S. 407, 423–424, 62 S.Ct. 1194, 86 L.Ed. 1563.

On the merits, we have concluded that we ought not to set aside the Commission's order.

■ This case is squarely ruled by the decision of the Supreme Court in United Gas Pipeline Co. v. Memphis Light, Gas & Water Division, 1958, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153; that is to say, where the service agreement does not prescribe a fixed rate to be charged, as was true in the Memphis case, the buyer may properly promise, as it did here, to pay for the natural gas at whatever rate is on file with the Commission, the schedule including which may, of course, be filed unilaterally by the vendor.

The only difference between the present case and the Memphis case is that the service agreement there did not contain the sentence italicized above: "Buyer shall have the right to protest any such new rate schedules and changes before the Federal Power Commission."

■ Petitioner makes much of this "right to protest" clause, contending that, as applied to industrial gas, it can only be construed to mean that the buyer must consent to the new rates to be

charged for such gas before the rates can be filed with the Commission. The protest clause is totally lacking in ambiguity; and we cannot see how a reserved right to protest new rates "before the Federal Power Commission" can confer a right to withhold consent to such rates before they are filed. All that is accomplished by the protest clause, we think, is to make it clear that the buyer has not waived any right to protest the reasonableness of the new charges before the Commission pursuant to § 717c(e) of the statute.

■ Nor can it be said that this rejection of petitioner's proposed interpretation of the contract must involve the conclusion that the contract is void for vagueness as applied to new industrial gas rates in that the price which petitioner must pay for industrial gas rests completely in the discretion of the supplier of the vendor. See Taller & Cooper v. Illuminating Electric Co., 7 Cir., 1949, 172 F.2d 625, 626. Many cases have held that a pricing provision is not void for vagueness where the provision is that the price to be paid by the buyer is to be governed by a rate list applicable to a number of buyers but subject to unilateral change by the seller. See Warren v. Skelly Oil Co., 10 Cir., 1956, 235 F.2d 722; Col-Tex Refining Co. v. Coffield & Guthrie, Inc., 5 Cir., 1952, 196 F.2d 788; Buggs v. Ford Motor Co., 7 Cir., 1940, 113 F.2d 618; Geyen v. Time Oil Co., 1955, 46 Wash.2d 457, 282 P.2d 287. See also Prosser, "Open Price in Contracts for the Sale of Goods," 16 Minn.L.Rev. 733, 769 et seq. (1932).

■ Alternatively, petitioner argues that if its preferred interpretation of the contract is rejected, then the provisions of the Natural Gas Act with reference to the suspension of new industrial gas rates must be unconstitutional. In this connection petitioner alleges that at common law it would have had a right to reparations against the seller if the rates charged by the public utility were judicially found to be unreasonable. Assuming, without deciding, the existence of such a common law right, we think that

petitioner should point to some provision of the Natural Gas Act which takes away that right. Granting that the Congress has conferred upon the Federal Power Commission the primary jurisdiction to inquire into the reasonableness of rates, rather than leaving that matter to the courts, we cannot find in the Act any provision which says that a common law action cannot be brought by the buyer to recover overcharges on rates which have been found by the Commission, in the exercise of its powers under § 717c(e), to be excessive.

But passing that difficulty, we do not believe that the legislative power is helpless to abolish a common law right without enacting a statutory right in its place. As stated in Munn v. Illinois, 1876, 94 U.S. 113, 134, 24 L.Ed. 77: "A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. * * * Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances."

As appears hereafter, the differences in treatment of industrial gas and non-industrial gas had a reasonable basis of fact to justify the distinctions made.

We assume that the arbitrariness of a classification, if it is bad enough, may be a violation of the due process clause of the Fifth Amendment even though that contains no equal protection clause. See Bolling v. Sharpe, 1954, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884; Marquez v. Aviles, 1 Cir., 1958, 252 F.2d 715, 717.

The enactment of the Natural Gas Act was preceded by some available legislative history. See, generally, DeVane, "Highlights of Legislative History of the Federal Power Act of 1935 and the Natural Gas Act of 1938," 14 Geo.Wash.L. Rev. 30 (1945). During the second session of the 74th Congress, hearings were held on H.R. 11662, an early draft of what finally emerged as the Natural Gas Act of 1938. At this time the Act contained no provision such as is now found in 15

U.S.C.A. § 717c(e) exempting industrial gas from the Commission's power to suspend rates. Instead, § 1(b) of H.R. 11662 provided that the Federal Power Commission was not authorized to consider or establish rates for the sale of industrial gas at all, on the perfectly rational ground that rigorous competition from other fuels assured a low price for industrial gas and thus rendered governmental supervision of the supplier's charges unnecessary. See Hearings on H.R. 11662, House Committee on Interstate and Foreign Commerce, 74th Cong., 2d Sess. at pages 17, 95, 108. Some arguments against the exemption of industrial gas from the regulatory powers of the Commission were also heard, particularly the argument that if industrial gas were left unregulated and subject to cutthroat competition, the Commission in fixing rates for domestic users of gas would have to consider the low profit of suppliers from sales of industrial gas and on that basis allow a greater profit on sales of domestic gas so as to give the supplier a fair profit on the investment as a whole. See Ibid. at 77–78. See also Ibid. at 108.

When the bill was reintroduced at the next session of the Congress, the proviso exempting industrial gas from all regulation had been deleted. However, on the floor of the House an amendment was offered, which is presently found in 15 U.S.C.A. § 717c(e), exempting industrial gas from the Federal Power Commission's power to suspend rates, and exempting industrial gas from the discretionary power of the Commission to require security from the supplier to make reparations in cases where new rates are set aside by the Commission as unreasonable after the period of suspension has expired. See 81 Cong.Rec. 6727 (1937). This compromise provision apparently was acceptable to those who originally had opposed any and all regulation of industrial gas. Moreover, Representative Lea, the draftsman of both bills, noted that contracts for industrial gas were, at that time anyway, usually of short-term duration, and that the effect of the pro-

viso was to prevent suspension when such short-term contracts were involved. See Ibid. at 6727–28. We cannot escape the conclusion that the Congress had a rational basis for saying that industrial gas needed less regulation than non-industrial gas.

A judgment will be entered affirming the order of the Federal Power Commission.