RICHMOND POWER AND LIGHT OF
the CITY OF RICHMOND, INDI-
ANA, Petitioner

v.

FEDERAL POWER COMMISSION,
Respondent

Indiana & Michigan Electric Company,
Intervenor

ANDERSON POWER AND LIGHT OF
the CITY OF ANDERSON, INDI-
ANA, Petitioner

v.

FEDERAL POWER COMMISSION,
Respondent

Indiana & Michigan Electric Com-
pany, Intervenor

Nos. 72-1963, 72-2035.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 26, 1973.

Decided May 25, 1973.

Rehearing Denied June 21, 1973.

Sandra J. Strebel, Washington, D. C.,
with whom George Spiegel, Washington,
D. C., was on the brief, for petitioner in
No. 72-1963.

Wallace L. Duncan, Washington, D. C., with whom Frederick D. Palmer, Washington, D. C., was on the brief, for petitioner in No. 72–2035.

Platt W. Davis, III, Atty. F.P.C., with whom Leo E. Forquer, Gen. Counsel, and George W. McHenry, Jr., Acting Sol., F.P.C., were on the brief, for respondent.

Peter J. Schlesinger, New York City, for intervenor. Edwin L. Weisl, Jr., Washington, D. C., also entered an appearance for intervenor.

Before WRIGHT and ROBB, Circuit Judges, and DAVIES,* Senior District Judge.

J. SKELLY WRIGHT, Circuit Judge:

Petitioners in these consolidated cases, two municipal power companies, seek review of an order of the Federal Power Commission accepting for filing tariffs tendered by intervenor, a public utility which sells petitioners electric power at wholesale. Petitioners contend that the tariffs, which implemented a rate increase and changed certain conditions of service, were inconsistent with existing contracts between petitioners and intervenor and therefore should have been rejected by the Commission. We agree and reverse.

## I. LEGAL SETTING

The Federal Power Act, 16 U.S.C. § 824 *et seq.* (1970), pertinent provisions of which are set forth in the margin,[1] requires in Section 205(c) that public utilities file all rates and contracts with the Commission for sales subject to the Commission's jurisdiction. Section

* Of the United States District Court for the District of North Dakota, sitting by designation pursuant to 28 U.S.C. § 294 (d) (1970).

1. 16 U.S.C. § 824d(c)—(e) (1970):

"(c) Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

"(d) Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

"(e) Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order

206(a) authorizes the Commission to modify any rate or contract which it determines, after a hearing, to be "unjust, unreasonable, unduly discriminatory or preferential * * *." Under Section 205(d) changes in previously filed rates must be filed with the Commission at least 30 days before they are to go into effect, and under Section 205(e) the Commission may suspend operation of the new rate for up to five months pending a determination of its reasonableness.

■ The Supreme Court of the United States has held that if a public utility, subsequent to entering into a contract for the sale of power, unilaterally files with the Commission under Section 205(d) a new tariff inconsistent with its contractual obligations, the newly filed tariff is a nullity and does not abrogate or supersede the contract. *See* United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L. Ed. 373 (1956); FPC v. Sierra Pacific Power Co., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956).

*Mobile* concerned provisions of the Natural Gas Act virtually identical with the provisions of the Federal Power Act summarized above. There a regulated natural gas company entered into a 10-year contract to supply natural gas at a single fixed price. Subsequently the company, without the consent of the buyer, filed new schedules with the Commission purporting to increase the rate. The Court held that the new schedule "was a nullity insofar as it purported to change the rate set by [the] contract" and "that the contract rate remained the only lawful rate." 350 U.S. at 347, 76 S.Ct. at 382. It reasoned that the Natural Gas Act evidenced no purpose to abrogate private rate contracts, and expressly recognized that rates to particular customers may be set by individual contracts. 350 U.S. at 338, 76 S.Ct. 373. This interpretation of the statutory scheme, according to the Court, did not impair the regulatory powers of the Commission, for the Commission could at any time enter into a proceeding to determine that the contract rate was unreasonable and could modify it if it so found. *See* 350 U.S. at 344–345, 76 S.Ct. 373. The *Sierra* case expressly adopted *Mobile*'s reasoning and holding in a similar situation arising under the Federal Power Act.

The *Sierra—Mobile* problem came before the Supreme Court again in United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958). There a regulated gas pipeline company had entered into long-term sale agreements. These agreements, unlike the ones in *Sierra* and *Mobile*, did not provide for a single fixed rate, but provided that "[a]ll gas delivered hereunder shall be

require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund with interest to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible."

16 U.S.C. § 824e(a) (1970):

"(a) Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affect[ing] such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order."

paid for by Buyer under Seller's Rate Schedule * * * *or any effective superseding rate schedules,* on file with the Federal Power Commission." 358 U.S. at 105, 79 S.Ct. at 196. (Emphasis by the Court.) The seller filed a new rate schedule purporting to increase rates over the last previously filed schedule. The Court held that the newly filed rate was the effective rate, and distinguished the case from *Mobile.* Interpreting the contract between the parties, the Commission had concluded that the seller "bound itself to furnish gas to these customers during the life of the agreements *not* at a single fixed rate, as in *Mobile,* but at what in effect amounted to its current 'going' rate." 358 U.S. at 110, 79 S.Ct. 194. (Emphasis in original.) The Supreme Court, after scrutinizing the record, concluded that there was ample support for the Commission's interpretation of the contract, both factually and legally. *See* 358 U.S. at 114, 79 S.Ct. 194. The Court therefore held that, rather than seeking unilaterally to abrogate its contractual undertaking, the seller in *Memphis* sought "simply to assert, in accordance with the procedures specified by the Act, rights expressly reserved to it by contract." 358 U.S. at 112, 79 S.Ct. at 199. It was therefore concluded that the seller could, *consistent with its contractual undertaking,* unilaterally increase its rate by filing a new tariff with the Commission.

The rule of *Sierra, Mobile* and *Memphis* is refreshingly simple: The contract between the parties governs the legality of the filing. Rate filings consistent with contractual obligations are valid; rate filings inconsistent with contractual obligations are invalid.[2] The two cases before us concern application of this rule to two slightly different con-

tractual undertakings. Although the Commission dealt with both cases in the same order, we will consider them separately because of these differences.

## II. RICHMOND POWER AND LIGHT OF THE CITY OF RICHMOND, INDIANA

Richmond Power and Light (hereinafter Richmond) is a municipally owned electric power company selling electricity to various retail customers. It generates part of the electric energy it sells and purchases the remainder of its requirements from intervenor Indiana & Michigan Electric Company (hereinafter I & M) pursuant to a 10-year contract dated November 15, 1965.[3] I & M is a public utility subject to the jurisdiction of the Federal Power Commission, *see* Indiana & Michigan Electric Co., 33 FPC 739 (1965), affirmed, 7 Cir., 365 F.2d 180, cert. denied, 385 U.S. 972, 87 S.Ct. 509, 17 L.Ed.2d 435 (1966), and its sales to Richmond are subject to the Commission's jurisdiction. I & M also has retail customers of its own in certain parts of Indiana, including many industrial users, and its sales to these customers are not subject to regulation under the Federal Power Act as the Act applies only "to the sale of electric energy *at wholesale* in interstate commerce * * *."[4] Instead, I & M's sales to its retail customers are subject to the jurisdiction of the Indiana Public Service Commission.

Since the Federal Power Commission had jurisdiction over I & M's sale of electricity to Richmond, the contract between I & M and Richmond was filed with the Commission under Section 205(c) of the Act, and was designated Rate Schedule FPC No. 58. As is common practice,[5] the contract between I &

2. *See also* Portsmouth Gas Co. v. FPC, 101 U.S.App.D.C. 99, 247 F.2d 90 (1957); Shell Oil Co. v. FPC, 3 Cir., 334 F.2d 1002, 1007 (1964).

3. Under its terms, the contract went into effect on January 1, 1966 and will expire on January 1, 1976 unless altered by agreement of both parties before that date.

4. 16 U.S.C. § 824(b) (1970) (emphasis added).

5. *See* United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division, 358 U.S. 103, 115 n. 8, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958).

M and Richmond does not itself contain a price term, but rather refers to a rate tariff of general applicability. In this case the contract provides that electric energy will be provided "at the rate and under the provisions of Company's [I & M's] Tariff I.P. as regularly filed with the Public Service Commission of Indiana, said tariff being selected by the Customer [Richmond], as long as said tariff is in effect * * *." The Tariff IP referred to in the contract is an industrial tariff that I & M negotiated for many of its municipal power company wholesale buyers as well as for many of its larger industrial retail customers. Tariff IP was on file with the Public Service Commission of Indiana when this contract was negotiated. Pursuant to the terms of the Richmond—I & M contract, the same Tariff IP as was then on file with the Public Service Commission of Indiana was attached to the contract when it was filed with the Federal Power Commission and became a supplement thereto. As a result, I & M's industrial retail customers, whose rates were governed directly by the Tariff IP on file with the Indiana Public Service Commission, and Richmond, whose rates were governed by the contract on file with the Federal Power Commission which expressly incorporated the Tariff IP on file with the Public Service Commission of Indiana, all received electric power subject to the same rate formula.

It is conceded that, consistent with the Richmond—I & M contract, I & M had the right to seek rate increases in the Tariff IP on file with the Indiana Commission. The contract language

"Tariff I.P. as regularly filed with the Public Service Commission of Indiana" obviously recognizes this possibility. Indeed, the contract expressly provides "and in the event said tariff is replaced by a new or revised tariff incorporating higher or lower rates than those stipulated in the aforementioned tariff, the Company will continue to furnish service as stipulated in the Agreement and the Customer will pay for such service at the higher or lower rates from and after the date when such rates are made effective." Acting consistently with the contract, then, I & M obtained from the Indiana Public Service Commission approval for a new Tariff IP which went into effect on March 29, 1972, implementing a rate increase of about 10 per cent.[6] Richmond also concedes that at this point, consistent with I & M's contractual obligation, I & M could have filed the new Tariff IP as a superseding supplement to the Richmond—I & M contract on file with the Federal Power Commission. But I & M did not take this step. Instead, it filed with the Federal Power Commission, as a superseding supplement to the Richmond—I & M contract, a Rate Schedule WS which effected a rate increase estimated at 45 per cent and also changed certain conditions of service. Richmond's basic position on this appeal is that I & M's filing of Rate Schedule WS was inconsistent with its contractual undertaking to sell Richmond electricity "at the rate and under the provisions of Company's Tariff I.P. as regularly filed with the Public Service Commission of Indiana * * * as long as said tariff is in effect * * *."[7]

7.   Richmond also claims that the filing violated a provision of the contract requiring notice and negotiation of any proposed modifications to the contract. The pertinent provision reads:

"At any time from the date of this Agreement either party, by giving not less than ninety days written notice to the other party, may from time to time call for a reconsideration of the terms and conditions of this Agreement, in-

cluding, but without limiting the generality of the foregoing, any change in the facilities to be provided by the parties and/or the operation of such facilities. If such reconsideration is called for, the authorized representatives of the parties shall meet promptly and discuss any changed conditions not foreseen or reasonably foreseeable at the date of this Agreement or at the conclusion of the next previous reconsideration, if any, and any other factors which might cause any inequities. Any agreement modifying

On its face Richmond's position appears unassailable. But in its order accepting Rate Schedule WS for filing, and in a subsequent order denying a rehearing, the Federal Power Commission has attempted what may charitably be termed an "end run" around that position; the Commission has made an effort to interpret the Richmond—I & M contract in a way that avoids compliance with the command of the *Mobile—Sierra —Memphis* cases.[8]

The Commission's analysis of the contract begins with this observation:

" * * * The contract provisions cited * * * indicate that, at the time the agreements were made, the Public Service Commission of Indiana was regarded as the regulatory body with jurisdiction and that rate changes were contemplated by the order or with the approval of that Commission. This Commission's jurisdiction over I & M's wholesale rates has since been asserted and confirmed, Indiana & Michigan Electric Company, 33 FPC 739 (1965), affirmed, 365 F. 2d 180 (C.A.7, 1966), cert. denied, 385 U.S. 972 [87 S.Ct. 509, 17 L.Ed.2d 435] (1966). * * *"

From this, the Commission argues in its brief that

"It is inconceivable that the parties intended to establish a rate for sales subject to the jurisdiction of the Federal Power Commission. Indeed, it is more likely that the parties intended that the contracts be subject to the ratemaking authority of the appropriate regulatory body. That organization is now the Federal Power Commission and its rate-changing procedures apply in full."

Brief for respondent at 15–16 (footnote omitted).

The problem with this whole argument is that, as applied to the Richmond —I & M contract, its first premise is factually incorrect. True, there was a time when it was assumed that I & M's sales to Richmond were subject to the jurisdiction of the Indiana Public Service Commission rather than the Federal Power Commission. But the contract between Richmond and I & M was entered into on November 15, 1965, and the Federal Power Commission's decision holding that it had jurisdiction over I & M's wholesale transactions had issued on April 15, 1965 after a lengthy investigation and hearing.[9] By July 1965 I & M had already commenced filing its wholesale for resale rate schedules with the Federal Power Commission pursuant to Section 205(c) of the Act.[10]

such terms and conditions shall specify the date such modification shall become effective."
I & M argues that changes in the appropriate tariff do not fall within this provision since it applies only to "changed conditions not foreseen or reasonably foreseeable at the date of this Agreement" and the contract admittedly foresees changes in Tariff IP. Since we find that I & M's filing violates the contract in other respects, we need not reach this question of contract interpretation.

8. The FPC has recently revealed its disagreement with the *Mobile* and *Sierra* decisions. In Carolina Power and Light Co., 47 FPC 1, 4 (1972), the Commission stated:
    "The conclusions expressed by [the presiding examiner] and affirmed by this Opinion and order are, in our judgment, the only conclusions available

to us, given the current state of the law as interpreted in *Mobile, Sierra,* and *Memphis*. We feel constrained, however, to express our misgivings with respect to these conclusions and to state that in our judgment the *Mobile-Sierra* rule is inconsistent with sound regulatory policy. That rule has the effect of limiting our authority under Section 206(a) of the Federal Power Act. * * *"
The FPC reiterated this position in Philadelphia Electric Co., Susquehanna Electric Co., Docket No. E–7726, Aug. 31, 1972, slip op. at 4.

9. *See* Indiana & Michigan Electric Co., 33 FPC 739 (1965), affirmed, 7 Cir., 365 F.2d 180, cert. denied, 385 U.S. 972, 87 S.Ct. 509, 17 L.Ed.2d 435 (1966).

10. Indiana & Michigan Electric Co., 35 FPC 298 (1966).

The contract was thus entered into with full knowledge that it was the Federal Power Commission, not the Indiana Public Service Commission, which had ultimate jurisdiction over the transactions covered in the contract.[11]

Richmond has given a most plausible explanation why Richmond and I & M, even though knowing that the Federal Power Commission had ultimate jurisdiction over their contract, agreed that the rate for electricity would be governed by the Tariff IP on file with the Public Service Commission of Indiana. According to Richmond, I & M and Richmond are competitors in certain respects: each tries to attract new industrial retail customers to its service territory and to keep existing industrial retail customers. The Richmond—I & M contract ensures that Richmond receives the same rate that I & M charges its own industrial retail customers. In other words, the contract ensures that Richmond, when it resells power to its industrial retail buyers, will be able to price itself competitively with the retail rates I & M offers to its own industrial customers. Absent such protection, I

& M could offer a lower price to its industrial retail customers than Richmond would be able to offer, thereby directing new industries away from Richmond's service territory and into I & M's retail service territory. And because of concerns relating to such matters as employment and the property tax base, Richmond, a municipally owned company, had an interest in encouraging industries to locate in its service territory.[12]

The Commission's order next states that this was not a "fixed-rate" contract under the *Mobile* and *Sierra* cases, as it permitted some change in the rates. Since rate changes were contemplated, the Commission argues, the case is properly controlled by the Supreme Court's decision in *Memphis*, where a unilateral filing was effective to change the rates. But this argument misperceives the rationale of the Court's holdings. Because the wholesale transactions regulated under the Natural Gas Act and the Federal Power Act "require substantial investment in capacity and facilities for the service of a particular distributor," both acts provide for individual arrangements

---

11. I & M argues that, even though the FPC order assuming juridiction over I & M's wholesale transactions had issued in 1965, the matter was still strongly contested on appeal, and it was not until the Supreme Court denied a writ of *certiorari* that the matter was considered settled. I & M contends, therefore, that even when Richmond's contract was negotiated the parties assumed that Indiana law rather than the Federal Power Act governed the contract. We find it hard to believe that sophisticated commercial entities such as I & M and Richmond would rest important long-term contractual obligations upon the hope that a court would reverse the FPC's order. In any event, for the reasons discussed in text *infra* at pp. 498–501, even if the parties both assumed in 1965 that Indiana law governed, we would still be constrained to interpret the contract as barring I & M from effecting changes in rates simply by filing a new tariff with the appropriate regulatory authority.

12. In this respect the relationship between the parties differs from that in United

Gas Pipe Line Co. v. Memphis Light, Gas & Water Division, *supra* note 5. There the buyers argued that it would be unreasonable to find that they intended, in signing the contract, to permit the seller to change its rate by unilaterally filing a new tariff. *See* 358 U.S. at 115–116 n. 10, 79 S.Ct. 194. The Court disagreed since it appeared, *inter alia*, that the buyers were entitled by contract with their customers to pass on any rate increases effected by the seller. *Ibid.* We may assume that such is the case here, although there is nothing in the record on the matter. This factor is not controlling here, however, since Richmond's alleged interest is not in having the rate remain static, but in having it remain in parity with the rates charged other industrial customers of I & M, thereby ensuring that I & M will not be able to have a competitive advantage in encouraging new industrial loads to locate in its service territory. Richmond thus had an interest in barring unilateral rate increases even if it could pass rate increases on to it customers.

between sellers and wholesale buyers, with the relations between the parties established initially by contract. *See* United Gas Pipe Line Co. v. Mobile Gas Service Corp., *supra,* 350 U.S. at 339, 76 S.Ct. at 378. By ensuring that contractual obligations cannot be circumvented by one party to the contract unilaterally filing with the Commission a new tariff inconsistent with those obligations, the *Mobile—Sierra—Memphis* doctrine "preserv[es] the integrity of contracts" and "permits the stability of supply arrangements which all agree is essential to the health of * * * industry." *Id.* at 344, 76 S.Ct. at 380. These principles apply whether the parties agree to a specific rate or whether they agree to a rate changeable in a specific manner. In either case the contract is binding, and a unilateral filing is ineffective to change it. The parties to this particular contract each had certain interests it sought to protect in drafting the provision under discussion. I & M, no doubt, wanted to be able to change its industrial tariff to reflect increased costs, inflation, and so forth, Richmond, in turn, wanted to ensure that it would not be placed in a competitive squeeze with respect to resale to industrial customers. The accommodation reached in the contract serves both these interests by permitting I & M to seek changes in its Tariff IP on file with the Public Service Commission of Indiana, but requiring that Richmond be served under the same tariff as that used by I & M for its own industrial retail customers. We see no reason why the integrity of this contractual undertaking is any less deserving of protection under the Act than one for a single fixed rate.

In its order denying a rehearing, the Commission adverted to Richmond's argument that the contract represented agreement by I & M that its wholesale rates to Richmond would be the same as I & M's retail rates in its Tariff IP on file with the Indiana Commission. The Federal Power Commission answers:

> "This Commission has exclusive jurisdiction over I & M's wholesale sales to * * * [Richmond], and I & M is obligated to charge those rates which are on file with this Commission. This Commission's jurisdiction cannot be limited or avoided by private contract. * * * *"

This response is most troubling, for it shows that the Commission simply does not understand, or more likely is not willing to abide by, the fundamental principle of the *Sierra—Mobile—Memphis* decisions. As the Supreme Court emphasized in *Mobile* in response to similar arguments, "[D]enying to natural gas companies the power unilaterally to change their contracts in no way impairs the regulatory powers of the Commission, for the contracts remain fully subject to the paramount power of the Commission to modify them when necessary in the public interest." 350 U.S. at 344, 76 S.Ct. at 381. Thus, in our own case, the Commission always remains free, upon its own motion, to enter into a proceeding under Section 206(a) of the Act to determine whether the contract rate between Richmond and I & M is "unjust, unreasonable, unduly discriminatory or preferential * * * *."[13]

13. The FPC has already entered into one investigation of the rates charged by I & M to its municipally owned wholesale customers. *See* Indiana & Michigan Electric Co., *supra* note 10. An order approving an offer of settlement, to which all parties agreed, was issued some two years later. *See* Indiana & Michigan Electric Co., 39 FPC 272 (1968). Under the settlement, each municipal wholesale buyer was given the option of switching from its present tariff to a new Tariff MRS, thereby obtaining a rate reduction.

*Evidently most municipalities availed themselves of this option, since when I & M tendered its Rate Schedule WS for filing in June 1972 the tender indicates that out of 16 municipal wholesale customers the rates of 12 were governed in June 1972 by Tariff MRS. Notably, Richmond and Anderson were among those municipal buyers that did not take advantage of the option and I & M's June 1972 tender states that their rates were still governed by Tariff IP.*

If it so determines, it can order the rate changed. If the Federal Power Commission believes that the Public Service Commission of Indiana is being niggardly in approving rate increases in Tariff IP, it is free to enter into a proceeding to require Richmond or any other wholesale buyer to pay a higher rate. In summary, the Richmond—I & M contract, like the contracts in *Mobile* and *Sierra*, does not limit the Commission's jurisdiction, for under the Act the Commission has no jurisdiction to change contract rates except after determining, through a proceeding under Section 206(a), that the contract rate is unreasonable.

The Commission's brief argues:

"* * * If public utilities were prohibited from filing rates believed to be consistent with the Federal Power Act, the company might lose revenues to which it is entitled by statute for the period between the termination of suspension and the Commission's ultimate decision on the just and reasonable rate. * * *"

Brief for respondent at 17. But surely this argument proves too much, for it also cuts against the holding in the *Sierra* case. There, after the seller unilaterally filed its rate increase, the Commission accepted the rate for filing but suspended it for five months pending the outcome of a Section 206(a) proceeding to determine its reasonableness. The Commission ultimately found that the new rate was reasonable (thereby implying that the contract rate was unreasonable), but the order embodying this finding did not issue until some nine months after termination of the five-month suspension. Since the Commission had accepted the new rate for filing, the new rate became the effective rate during this nine-month period. The Court expressly held that the filing should have been rejected, as inconsistent with contractual obligations, and that the Section 206(a) determination "can effect no change prior to the date of the order * * *." 350 U.S. at 353, 76 S.Ct. at 371. Thus the Court

recognized that the contract rate, even if it was ultimately determined to be unreasonably low, remained the only lawful rate until the date of the Commission's order in the Section 206(a) proceeding. Nor is there anything particularly inequitable about this result, since it was the seller after all who, through arm's length negotiation, entered into the contract in the first place. And, as stated in *Mobile,* this result was simply part of the "reasonable accommodation" afforded by the Act "between the conflicting interests of contract stability on the one hand and public regulation on the other." 350 U.S. at 344, 76 S.Ct. at 381.

III. ANDERSON POWER AND LIGHT OF THE CITY OF ANDERSON, INDIANA

Anderson Power and Light (hereinafter Anderson) is also a municipally owned electric power company selling electricity to assorted retail customers. Unlike Richmond, it no longer generates any electricity but purchases all of its requirements from I & M pursuant to a long-term agreement. In matters relevant to the issues before us, the Anderson—I & M contract is identical with the Richmond—I & M contract except in two respects. First, and most importantly, the Anderson—I & M contract was entered into on April 17, 1957 at a time when both parties to the contract admittedly assumed that the Public Service Commission of Indiana, not the Federal Power Commission, had ultimate jurisdiction over the contract. In addition, the relevant contract language is slightly different. Whereas the Richmond—I & M contract referred to the "Tariff I.P. as regularly filed with the Public Service Commission of Indiana," the Anderson—I & M contract provides, in pertinent part, that I & M will provide electric energy "at the rate and under the provisions of the regularly filed and published tariff selected by the Customer [Anderson] and known as Tariff I.P. (a copy of which is attached hereto), as long as said tariff is in effect * * *." In other respects

the Anderson case is identical with the Richmond case. Here too I & M filed with the Federal Power Commission the new Rate Schedule WS purporting to increase Anderson's rates, and here too Anderson claims that since there is a Tariff IP still in effect before the Indiana Public Service Commission I & M's filing violates its contractual commitment to serve Anderson "at the rate and under the provisions of the regularly filed and published tariff * * * known as Tariff I.P. * * * as long as said tariff is in effect * * *."

We do not believe either of the differences between the Anderson contract and the Richmond contract affects the outcome of the case, though we reach that conclusion through reasoning quite different from that used in the previous section to discredit the Commission's interpretation of the Richmond—I & M contract.

We begin our analysis again by reference to the Commission's order accepting I & M's Rate Schedule WS for filing. After recognizing, correctly in this case, that the contract was entered into at a time when it was assumed the Public Service Commission of Indiana had jurisdiction over the transaction, the order notes "that rate changes were contemplated by the order or with the approval of that Commission." The order then refers to another recently decided case, concerning another Indiana wholesale power contract, wherein the Commission stated:

> "Our review indicates that when read in their entirety, the subject contracts by their express provisions contemplate changes in the rates and charges for electrical power by or with the approval of the Public Service Commission of Indiana. Since 1965 sales under such contracts have

been expressly held to be subject to the jurisdiction of the Federal Power Commission. We therefore find that because the contracts contemplate changes in rates and charges by the appropriate regulatory authority, [the seller] is not precluded from filing for an increase in its filed rates, and the rate filing procedures of Section 205 of the Federal Power Act are applicable to this proceeding. The *Sierra* and *Mobile* cases, *supra*, do not therefore apply. United Gas Pipeline Company v. Memphis Light, Gas and Water Division, et al., 358 U.S. 103, [79 S.Ct. 194, 3 L.Ed.2d 153] (1958). We shall therefore deny the motions [to reject the filing]." [14]

The Commission seems to be saying that it is simply interpreting the contract, in light of changed circumstances, to accomplish what the parties intended. And we have no quarrel in principle with this approach to contract interpretation.[15] But the Commission's analysis of what the parties intended in this instance, and its attempt to fit this case within the *Memphis* mold, will not stand scrutiny. The Commission says that the parties contemplated rate changes "by the order or with the approval of" the appropriate regulatory commission. This may well be true, but it is beside the point. The issue under *Memphis* is not whether the parties contemplated change by the appropriate regulatory authority, for under the law every electric power contract must contemplate such change. Instead, the question is whether the parties contemplated that the seller could unilaterally effect a change in the rate simply by filing a new tariff with the appropriate regulatory agency.[16] And if we begin with the Commission's observation that the parties to the Anderson—I & M

14. Public Service Co. of Indiana, Inc., —— FPC ——, —— (Docket No. E-7645, Feb. 25, 1972) (slip op. at 2) (footnote omitted).

15. *See* W. C. Shepherd Co. v. Royal Indemnity Co., 5 Cir., 192 F.2d 710, 715 (1951); Pacific Portland Cement Co. v.

Food Machinery & Chemical Corp., 9 Cir., 178 F.2d 541, 551–553 (1949); Restatement of Contracts § 235, Comment *e* & Illustration 8, at 324–325 (1932).

16. *See* United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division, *supra* note 5, 358 U.S. at 110, 79 S.Ct. 194.

contract contemplated that Indiana law rather than the Federal Power Act governed their contract, we can see that the parties never contemplated anything of the sort.

Under Indiana law no change can be made in any public utility rate schedule except upon approval by the Public Service Commission of Indiana.[17] A public utility may file a petition requesting an increase in its own rate,[18] and the Commission must then proceed with an investigation into the lawfulness of the rates.[19] But no order affecting the rates can be entered by the Commission without a formal public hearing,[20] and no rate change is effected until there is an order by the Commission approving the increase.[21] In other words, no rate could be increased under Indiana law without going through a procedure similar in many respects to the procedure established in Section 206(a) of

the Federal Power Act. The mere act of filing a rate increase did not effect a rate increase under Indiana law. There had to be affirmative approval of the increase by the Public Service Commission, after an investigation and a hearing. Indeed, in the instant case when I & M sought a 10 per cent increase in Tariff IP before the Public Service Commission these procedural requirements apparently were followed. I & M filed an application with the Public Service Commission to increase its rates in July 1971. The matter came on for a hearing before the Public Service Commission in January 1972. On March 24, 1972 the Commission approved the rate increase by order. Only then was it permitted to take effect.

We think that if one is to construe the Anderson—I & M contract, in light of changed circumstances, to reflect as nearly as one can the intentions of the

17. *Change of rates, how made.*—No change shall thereafter be made in any schedule, including schedules of joint rates, except upon thirty [30] days' notice to the commission *and approval by the commission* and all such changes shall be plainly indicated upon existing schedules or by filing new schedules in lieu thereof thirty [30] days prior to the time the same are to take effect * * *.
10 Burns Ind.Stat.Ann. § 54–317 (1951 Replacement Vol.), IC 1971, 8–1–2–42 (emphasis added).

18. *Complaint by public utility.*—Any public utility may make complaint as to any matter affecting its own rates or service with like effect as though made by any mercantile, agricultural or manufacturing society, body politic or municipal organization or by any ten [10] persons, firms, corporations or associations. Whenever any public utility shall file a complaint or petition as to any matter concerning an increase of its own rates, affecting its patrons in any county in which such public utility renders service, the public utility shall publish a notice of the filing of such petition or complaint in a newspaper of general circulation published in such county.
10 Burns Ind.Stat.Ann. § 54–415 (1972 Cum.Pocket Supp.), IC 1971, 8–1–2–61.

19. *Complaints—Investigation and hearing.*—Upon a complaint made against any

public utility by any mercantile, agricultural or manufacturing society or by any body politic or municipal organization or by ten [10] persons, firms, corporations or associations, or ten [10] complainants of all or any of the aforementioned classes, or by any public utility, that any of the rates, tolls, charges or schedules or any joint rate or rates in which such petitioner is directly interested are in any respect unreasonable or unjustly discriminatory, or that any regulation, measurement, practice or act whatsoever affecting or relating to the service of any public utility, or any service in connection therewith, is in any respect unreasonable, unsafe, insufficient or unjustly discriminatory, or that any service is inadequate or can not be obtained, the commission shall proceed, with or without notice, to make such investigation as it may deem necessary or convenient. But no order affecting said rates, tolls, charges, schedules, regulations, measurements, practice or act, complained of, shall be entered by the commission without a formal public hearing.
10 Burns Ind.Stat.Ann. § 54–408 (1951 Replacement Vol), IC 1971, 8–1–2–54.

20. *See* note 19 *supra.*

21. *See* notes 17 & 19 *supra.*

parties to the contract, the only possible result is to construe it as not permitting I & M to change the rate simply by filing a new tariff with the Federal Power Commission. This case, then, is critically different from *Memphis*, where it was evident that the parties to the contract contemplated that the seller could unilaterally change the rate by filing a superseding tariff with the Commission. *See* 358 U.S. at 105, 114–115, & n.9, 79 S.Ct. 194. *See also* Pacific Natural Gas Co. v. FPC, 9 Cir., 276 F.2d 350, 351 (1960).

The obvious truth of the matter is that Anderson, like Richmond, intended to key its rates to those charged by I & M to its own industrial customers in order to protect itself against the same competitive squeeze that concerned Richmond. Any uncertainties one might have as to what the contracting parties intended are set to rest by the fact that in 1969, some four years after it had become clear that the Federal Power Commission was the appropriate regulatory body, I & M tendered to Anderson for its approval a new contract which provided, in terms identical with the Richmond—I & M contract, that electricity would be furnished "at the rate and under the provisions of Company's Tariff I.P. as regularly filed with the Public Service Commission of Indiana * *." [22]

The parties to both the Richmond and the Anderson contracts intended that the municipal buyers receive electricity under the same tariff that governed I & M's industrial retail customers. While they contemplated changes in Tariff IP, they never contemplated that those changes could be effected merely by I & M's filing a new tariff. As a result, I & M's filing of Rate Schedule WS as a superseding supplement to both contracts was inconsistent with its contractual obligations and

those filings should have been rejected. Accordingly, we remand these cases to the Commission with directions to reject I & M's filings and to initiate such proceedings as may be necessary to secure refunds of the incremental amounts paid by Richmond and Anderson to I & M since the time Rate Schedule WS was erroneously allowed to become effective.

So ordered.

---

22. Reply brief of Petitioner Anderson Power and Light, Exhibit A–1, at 3–a. Anderson never approved the tendered contract and it is therefore not binding as such. It is indicative, however, of the intentions of the parties to the 1957 agreement, as manifested in subsequent conduct. *See generally* S. Williston, Contracts § 723 (3d ed. 1961). *See also* Restatement of Contracts, *supra* note 15, § 235(e). *Cf.* note 13 *supra*.