**NATURAL GAS PIPELINE COMPANY OF AMERICA, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

**Dorchester Corporation, Intervenor.**

No. 11862.

United States Court of Appeals Third Circuit.

Argued Dec. 2, 1957.

Decided Feb. 26, 1958.

Rehearing Denied April 10, 1958.

**4**

Carl McGowan, Chicago, Ill. (Ross & O'Keefe, Clarence H. Ross, Roland D. Whitman, Chicago, Ill., on the brief), for Natural Gas Pipeline Co. of America.

C. Louis Knight, Washington, D. C. (Willard W. Gatchell, Gen. Counsel, Federal Power Commission, Washington, D. C., on the brief), for respondent.

Gene M. Woodfin, Houston, Tex. (James J. Flanagan, Dunnington, Bartholow & Miller, New York City, Vinson, Elkins, Weems & Searls, Houston, Tex., on the brief), for intervenor Dorchester Corp.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The dispositive question here is, what was the lawful contract rate on June 7, 1954 for gas sold by intervenor, Dorchester Corporation to petitioner?

Dorchester is an independent producer of natural gas in Oklahoma. It is the immediate successor of Panoma Corporation which had originally succeeded the partnership of Harrington and Marsh as such producer.[1] Natural, the petitioner, on December 1, 1946, contracted with that partnership for the purchase of natural gas from the Guymon-Hugoton field in Oklahoma. The contract ran expressly until January 1, 1965 and at buyer's option as long thereafter as sellers are able to deliver gas in paying quantities from reserves allocated to the agreement. The price of 5.12¢ per Mcf (14.65 psia) increased to 6.253¢ per Mcf on July 1, 1951 until July 1, 1956 and thereafter was fixed at 7.145¢ per Mcf.

By its article Fourteenth the agreement is "* * * subject to present and future valid laws and present and future lawful orders of all regulatory bodies now or hereafter having jurisdiction over the parties * * *."[2] On July 29, 1952 the order of the Oklahoma Corporation Commission fixed 9.8262¢ per Mcf (14.65 psia) as the minimum price for which gas produced in the Guymon-Hugoton field may be first purchased or sold. Natural advised Panoma, which had by then succeeded the partnership, that the Oklahoma Commission order did not apply to gas purchased by Natural under the December 1, 1946 contract, as amended. It stated that it was appealing from the order and that, pending final adjudication of its validity as to the contract gas, it would under protest pay in accordance with the state commission order and "In the event such order shall be held invalid or inapplicable to the gas sold and delivered by you to us under such contract, Natural will assert the right under familiar doctrines of business compul-

---

1. At the time when Panoma was in process of disposing of its leasehold interests to Dorchester, Natural was requested to consent to the transfer. It did so upon the clear understanding that:

"It is expressly stipulated, moreover, that such confirmation by Natural shall not impair any rights which Natural may have against any person, firm or corporation to recover the difference between the contract price and the price actually paid by Natural by reason of minimum price orders for gas delivered under the Gas Purchase Contract by such person, firm or corporation."

2. Article Fourteenth in full reads:

"Contract Subject to Laws and Regulations.

"This contract is subject to present and future valid laws and present and future lawful orders of all regulatory bodies now or hereafter having jurisdiction over the parties; and should at any time during the term of this contract either party, by force of any such law or regulation imposed, be ordered or required to do any act inconsistent with the provisions of this contract, the contract shall, subject to the other provisions hereof, continue nevertheless, but shall then be deemed modified to conform with the requirements of such law or regulation."

sion, unjust enrichment and restitution to a return to Natural of the additional payments so made under protest, with lawful interest thereon."

On Natural's appeal the Oklahoma Supreme Court on April 27, 1954, Natural Gas Pipeline Co. of America v. Corporation Commission, 272 P.2d 425, affirmed the state commission's order. An appeal was taken to the United States Supreme Court, 349 U.S. 44, 75 S.Ct. 578, 99 L.Ed. 866. On June 7, 1954, the litigation took on a new complexion, for it was on that date that the United States Supreme Court, independent of the foregoing, announced its opinion in Phillips Petroleum Co. v. State of Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035. The effect of that decision was to render Dorchester, as a producer of natural gas, subject to regulation by the Federal Power Commission under the Natural Gas Act, 15 U.S.C.A. § 717 et seq. Formerly producers such as Dorchester, not engaged in interstate transport of natural gas, had regarded themselves as exempt from such regulation. The Commission subsequently issued orders [3] providing the mechanics for bringing independent producers under the Commission's supervision. Dorchester was thereby required to file "rate schedules, as defined in § 154.93, setting forth the terms and conditions of service and all rates and charges for such transportation or sale effective on June 7, 1954." Rate schedules were defined in § 154.93 as meaning " * * * the basic contract and all supplements or agreements amendatory thereof, effective and applicable on and after June 7, 1954, showing the service to be provided and the rates and charges, terms, conditions * * *" etc.

On July 1, 1954 Dorchester had succeeded Panoma.[4] On October 28, 1954 it tendered to the Commission for filing, the contract with Natural plus three supplements. Two of these were bona fide amendments to the contract and of no special importance. The third was a copy of the Oklahoma Corporation Commission's minimum price order, then on appeal to the United States Supreme Court, which Dorchester claimed fixed the actual contract price as of June 7, 1954 at 9.8262¢ per Mcf. Natural protested this to the Commission as illegal and requested that if the Commission did accept the nine cent rate for filing, that is, temporarily, that the payments in excess of the six cent contract rate be held in escrow, to be returned to Natural in the event the state minimum rate was finally declared illegal by the Supreme Court. On November 30, 1954 the Commission accepted for filing Dorchester's tender, on the condition that the 9.8262¢ per Mcf minimum price be upheld by the United States Supreme Court. Thereafter Natural paid for its gas at that rate reserving the right to recover the excess if it were found to be unlawful.[5]

On December 6, 1954, Dorchester presented for filing its Supplement #4 which called for a rate of 10¢ per Mcf under the contract. The Commission suspended this proposed change until March 1, 1955, and called for a hearing as to its lawfulness. On April 7, 1955, four days before the Supreme Court filed its opinion invalidating the state-fixed rate, on Dorchester's motion, the Commission by

---

3. These orders promulgated §§ 154.91, 154.92 and 154.93 of the Commission's Regulations. 19 Federal Register 4534 (1954). These were subsequently modified to an extent not material here. 19 Federal Register 5091, 6301, 8808 (1954).

4. The arrangements by which this was accomplished are complex. We think it irrelevant to this dispute that the success of these arrangements may to some degree depend on Dorchester's receiving payments at 9.8262¢ per Mcf rather than at the contract rate. Natural, and Nat-

ural's customers, are not to be deprived of the benefit of the contract entered into openly and at arm's length because of Dorchester's later unjustified reliance on the validity and permanence of the higher rate which it knew was being appealed, with strong likelihood of success under Phillips Petroleum Co. v. State of Wisconsin announced three weeks earlier.

5. Natural has presently a suit in the Delaware Federal District Court to obtain refund of its excess payments from July 1, 1954 to March 1, 1955.

order permitted the ten cent rate to become effective as of March 1, 1955. This was subject to further order of the Commission after the above referred to hearing and contingent upon Dorchester posting a $41,000 bond covering refund of any portion of the increase eliminated by the Commission as a result of the hearing. Because the required bond merely took care of any difference between the Oklahoma Commission minimum of 9.8262¢ and the sought for ten cent figure, Natural asked that the Commission reconsider the amount of the bond and that it be made sufficient to protect the difference between the contract 6.253¢ and the ten cents allowed Dorchester. It was about this time that the Supreme Court on April 11, 1955, holding Phillips Petroleum Co. v. State of Wisconsin to be controlling, ruled the 9.8262¢ rate invalid as having been imposed beyond the power of the State. Natural Gas Pipeline Company of America v. Corporation Commission of State of Oklahoma, 1955, 349 U.S. 44, 75 S.Ct. 578, 99 L.Ed. 866.[6] Thereafter a hearing was held on Natural's protest at the inadequacy of the bond to be required of Dorchester pending the Commission's determination of entitlement to the 10¢ rate. On September 14, 1955 the Presiding Examiner of the Commission sustained the protest and ordered a bond in the sum of $742,000. On November 14, 1955 while the uncompleted hearing on the lawfulness of the ten cent rate was in recess, the Commission reversed its Presiding Examiner and reinstated the $41,000 bond. It did so simply by stating that the 9.8262¢ rate was the one actually effective and being paid on June 7, 1954. The facts that it was under protest, that a lesser amount was paid for a short time thereafter, or that the rate was subsequently declared invalid were, according to the Commission, irrelevant to the determination of the effective rate on June 7, 1954.

The Commission in fact rejected its earlier conditional acceptance of the 9.82-62¢ rate as having been a condition improvidently granted. Thereafter, in view of this, when the ten cent rate hearing was resumed Dorchester withdrew its filing of that rate. It was agreed by everyone that all the evidence as to that question had been offered and that the record was closed. The intermediate decision was omitted on motion and the record certified to the Commission. The latter, on January 5, 1956, dismissed the ten cent rate and reinstated the 9.8262¢ rate, relying apparently on the November 14th order which had found that to be the effective rate on June 7, 1954. Dorchester was ordered to refund the difference between the ten cent amount paid and 9.8262¢, from the date of the allowance of the ten cents. The Commission in this fashion made it clear that so far as it was concerned the 9.8262¢ rate was the one effective and applicable on June 7, 1954. Thus Natural was deprived of its contract rate through a unilateral filing of a higher rate by Dorchester, with no hearing or finding by the Commission—the only regulatory agency with authority over the contract rate—as to the illegality of that rate.

■■ Another move in this astonishing sequence of events had occurred on December 27, 1955, when Dorchester "[t]o remove any uncertainty with respect to the status of the rate proceeding * * *" filed a 9.8262¢ rate to be effective as of March 1, 1955. Natural objected to this procedure. The Commission referred to it in its January 5, 1956 order but did nothing else regarding it, and acted as above outlined. On February 3, 1956, the Commission by letter stated that it had decided to treat the December 27, 1955 filing as Supplement #6 (there was no Supplement #5) to be effective at the expiration of the thirty days statutory notice which had elapsed January 27, 1956, and that the 9.8262¢

6. See Michigan Wisconsin Pipe Line Co. v. Corporation Commission of State of Oklahoma, 78 S.Ct. 409; Phillips Petroleum Co. v. Corporation Commission of State of Oklahoma, 78 S.Ct. 409, 410, and Cities Service Gas Co. v. State Corporation Commission of Kansas, 78 S.Ct. 381.

rate became effective on that date. Once more Natural objected. On February 24, 1956, the Commission, accepting that protest as an application for rehearing on its February 3rd decision, denied it.

In our endeavor to ascertain the legal rate on June 7, 1954 for the gas contracted for by Natural from Dorchester we start with the governing law laid down by the Supreme Court in its Mobile decision.[7] Under that law a unilateral filing of a new rate by one party cannot, over the protest of another party, annul the rate established by contract between the parties. The fact that the Mobile case dealt with an attempt to supersede an already filed rate and that the instant case is concerned with the filing of an initial rate is an immaterial difference. The Court pointed out in 350 U.S. at page 344, 76 S.Ct. at page 381 that "* * * denying to natural gas companies the power unilaterally to change their contracts in no way impairs the regulatory powers of the Commission * * * to modify them when necessary in the public interest." The shortcoming here has been that the Commission made no attempt to find what was in the public interest. The Court in Mobile further indicated, 350 U.S. at page 344, 76 S.Ct. at page 381, that while natural gas companies are precluded "* * * from unilaterally changing their contracts simply because it is in their private interests to do so, * * *" they nonetheless have under § 5(a) of the Natural Gas Act "* * * an avenue of relief when their interests coincide with the public interest." Thus while they understandably are "* * * not given the same explicit standing to complain of their own contracts as are those who represent the public interest or those who might be discriminated against, there is nothing to prevent them from furnishing to the Commission any relevant information and requesting it to initiate an investigation on its own motion. And if the Commission, after hearing, determines the

contract rate to be so low as to conflict with the public interest, it may under § 5(a) authorize the natural gas company to file a schedule increasing the rate." But the Court declared in the related case of Federal Power Commission v. Sierra Pacific Power Company, 1956, 350 U.S. 348, 354–355, 76 S.Ct. 368, 100 L.Ed. 388, that the contract rate is not necessarily unreasonable because it yields less than a fair return. Though it is true that the Commission may not normally impose a rate affording less than a fair return it does not follow that the Commission is required to relieve a company of an improvident bargain which affords less than a fair return.

■ The contract rate could only be changed, then, (unless the parties consented) after a hearing by the Commission as to its lawfulness unless, as set out in the agreement itself, a valid law and lawful orders of regulatory bodies having jurisdiction over the parties affected it. It was expressly because of these elements that Natural, after the Oklahoma Commission had established a minimum rate and while its lawfulness was being litigated, paid the state-fixed purchase price under protest. When the United States Supreme Court found Oklahoma's action to have been unlawful and set the state commission order aside, there was no longer even the semblance of a valid law, or lawful order which could modify the contract rate. The contract rate, therefore, under the mandate of the Supreme Court must be held to have been the rate effective on June 7, 1954.

The Commission concedes in its brief on the question whether Dorchester's effective rate on June 7, 1954 was 9.8262¢ or 6.253¢ "that forceful arguments can be made in support of either rate." The Intervenor admits, as it must, that Mobile prevents "the filing of an increase in the contract rate by unilateral action". However, it insists that because the Oklahoma order had not yet been found un-

7. United Gas Pipe Line Company v. Mobile Gas Service Corporation, 1956, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373.

lawful on June 7, 1954, the rate established by that order became the effectively filed rate for all purposes despite the fact that Natural then, and unceasingly from then on, denied Oklahoma's jurisdiction and expeditiously brought the issue to the United States Supreme Court where its position was completely vindicated. The Commission itself had specifically recognized the situation for what it was. It had accepted the filing by Dorchester of the Oklahoma price, contingent upon the eventual decision of the Supreme Court as to just what was the effective lawful rate for the purchase and sale of gas between Natural and Dorchester on June 7, 1954. That has now been determined. No amount of facile argument can hide the fact that the contract rate was the effective lawful rate and must be so accepted by the Commission and Dorchester.

The suggestion of the Commission and intervenor that this point was not made before the Commission in the applications for rehearing as called for by Section 19(b) of the Act, is frivolous. Natural throughout this labyrinthian process had urged to the Commission that its contract rate could not be destroyed unilaterally. This was squarely within the record and was a most important part of Natural's objection to the increase from the time Dorchester filed the Oklahoma Commission order to its objection to the Commission allowing the filing of December 27, 1955 to become effective. It was an express ground upon which the petition for rehearing of the January 5, 1956 order was based. The language of the Supreme Court in its Mobile opinion could hardly have been quoted in any of those objections as the opinion was not filed until February 27, 1956. But the rationale of the Mobile holding was present in all of Natural's protests. The Commission and Dorchester had full notice from the time the Oklahoma rate was filed by the intervenor of the claim by petitioner that such move was illegal and would be contested. The Commission's order of November 30, 1954, above referred to, accepting for filing the state commission price order reveals total knowledge of the circumstances. It said in that order:

*"In view of the foregoing, it appears to the Commission that the question of whether the price of 9.862¢ per Mcf at 14.65 psia is the effective price as of June 7, 1954, for the sale of gas by Dorchester to Natural, as claimed by the former, is dependent upon whether the aforesaid Order No. 26096 of the Corporation Commission of the State of Oklahoma is valid as to such sale. That question is presently before the Supreme Court of the United States in Cause No. 321, October Term 1954 for decision. [Natural Gas Pipeline Co. of America v. Corporation Comm., 349 U.S. 44, 75 S.Ct. 578, 99 L.Ed. 866].*

*"To protect the respective rights of both Dorchester and Natural, it is appropriate to carry out the provisions of the Natural Gas Act that we permit the filing by Dorchester of the tenders of October 28, 1954, subject to the express understanding and condition that such filing is proper only if Order No. 26096 is valid as to the sale by Dorchester to Natural covered by the filings, but not otherwise."* (Emphasis supplied.)

Much the same so-called technical objection is argued by the Commission with respect to petitioner's attack on the Commission's action of February 24, 1956. The petitioner, says the Commission, failed to file application for rehearing under Section 19(a). As has been noted in the statement above, it was the Commission which deliberately and authoritatively designated petitioner's protest telegram of February 8, 1956 as its application for rehearing and accepted it as such. The telegram plainly put the Commission on adequate notice of petitioner's objections. Amazing as this litigation was in its development, petitioner can hardly be held for a failure to anticipate a trap. It had the right to rely on the Commission's February 24th

designation of its earlier letter protest as an application for rehearing, high-handed though that designation may have been. At this stage the Commission cannot in good faith strive to construe § 19(a) as requiring a petition for rehearing of a summary denial of a rehearing. Review would never become available to an aggrieved party by that line of reasoning.

The Commission also contends that petitioner was not aggrieved by its February 24th order. The Commission says the 9.8262¢ rate that it permitted to be filed by its letter authorization and which it confirmed by the order of February 24th effected no change in the rate it had allowed on January 5, 1956. Consequently, the Commission now argues, it had no power under the Act to sanction that move, whatever the purpose of the move may have been. But obviously if the January 5th order were reversed, it could and probably would be claimed that the February approval established a sound nine cent rate from January 27, 1956 when the thirty day notice time elapsed. In this light the aggrievement to petitioner by the Commission's acceptance of the filing cannot reasonably be denied. And the voiding of that step is not to be defeated by the hint that the Commission decision in the form of a letter does not meet with the requirements of Section 19(b) as to that body's method of decision. What we have is the considered Commission final judgment on Dorchester's December 28th filing. The Commission emphatically reiterated that view when it accepted petitioner's telegram as an application for rehearing of its decision, directly under Section 19(a). For the third time it solemnly attested to this when it made its order denying the rehearing application. We are wholly satisfied that the form of the decision of the Commission is well within Section 19(b).

By its order of November 14, 1955 the Commission reversed the holding of its

Presiding Examiner and reduced Dorchester's bond from $742,000 to $41,000. As we have seen, petitioner was entitled to protection on the difference between the six cent rate and the Oklahoma nine cent price. The $742,000 was designed to furnish this. The declared purpose of the $41,000 bond was to safeguard petitioner should the rate be ultimately determined as 9.8262¢ instead of ten cents. The reversal of the finding of the Presiding Examiner was erroneous but since we are now holding that the proper rate on June 7, 1954 was 6.253¢ there is no need of ordering a replacement bond in some adequate sum.

■ Finally, respondent and intervenor by motion to dismiss and on the merits maintain that petitioner is not aggrieved by any of the Commission orders involved.

We have dealt with the order of February 24, 1956 immediately above. Other than it, the argument seems to be that because the advance in the price to Natural has been reflected in the price to its customers, Natural has not been aggrieved.[8]

This proposition is at the least, unrealistic. Natural is entitled to deal with its customers ethically and, engaged in a fiercely competitive business as it is, must do so in order to survive. It could not stand by and suffer an unlawful fifty-seven per cent increase to be loaded on its purchasers. There is no indication that the latter are captive buyers or that they would submit to that sort of treatment. So it has been not only high level business but sound business for Natural to contest the issue. All in all Natural is truly an aggrieved person within § 19(b) of the Act.

The motion to dismiss is denied.

Since our basic conclusion is that the lawful contract rate on file June 7, 1954 was 6.253¢ per Mcf:

The Commission's order of January 5, 1956 is modified so as to provide that ef-

8. Natural is committed formally to the Commission to refund to its customers in turn any refunds it collects from Dorchester. Natural's distributor customers in turn have agreed with the Illinois Commission to pass the refunds along to its customers, the ultimate consumers.

fective as of the date thereof, the rate of 6.253¢ per Mcf be reinstated as the effective rate for the period prior to March 1, 1955. Paragraph (D) of said order is modified so as to direct that the refund to be made by Dorchester to petitioner pursuant thereto be computed on the basis of the difference between 10¢ per Mcf and 6.253¢ per Mcf for the period from March 1, 1955 to January 5, 1956.

The order of February 24, 1956 is set aside and the Commission is directed to rescind its action as reported in its notice of February 3, 1956 and to reject the filing tendered by Dorchester on December 27, 1955 and to strike Supplement #6 from its files.

In accordance with the present position of petitioner in respect to the arrangements as to its payments in excess of the contract price since January 5, 1956, we are making no specific order concerning those payments.