**BOROUGH OF LANSDALE, PENNSYL-VANIA, Petitioner**

v.

**FEDERAL POWER COMMISSION, Respondent**

**Philadelphia Electric Company, Intervenor**

Nos. 73-1031 and 73-1649.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 15, 1974.

Decided March 15, 1974.

Rehearing Denied April 15, 1974.

---

Charles F. Wheatley, Jr., Washington, D. C., with whom Jerome C. Muys, Washington, D. C., was on the brief, for petitioner.

William M. Sawyer, Atty., Federal Power Commission, with whom Leo E. Forquer, Gen. Counsel, and George W. McHenry, Jr., Acting Sol., Federal Power Commission, were on the brief, for respondent.

Ernest R. von Starck, Philadelphia, Pa., of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of court, with whom Abraham R. Spalter, Washington, D. C., was on the brief, for intervenor.

Before WRIGHT and McGOWAN,* Circuit Judges, and WYZANSKI,** Senior District Judge.

J. SKELLY WRIGHT, Circuit Judge:

The Borough of Lansdale seeks review of several orders,[1] issued without an evidentiary hearing, by which the Federal Power Commission authorized the Philadelphia Electric Company (intervenor here) to charge Lansdale higher rates for electric power than those set in an outstanding fixed-rate contract[2] between the Borough and the company. Specifically, the orders summarily accepted the company's filing of the higher rates, set a hearing to determine their reasonable-

ness, and provided that the fixed-rate contract would be "immaterial" to the determination because the contract is "presumptively not in the public interest." The Borough relies on FPC v. Sierra Pacific Power Co., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956), and United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956), which held that the Commission may not sanction rate increases inconsistent with a fixed-rate contract, over objection of one of the parties, unless and until an evidentiary hearing has shown the contract rates to be lower than the "public interest" requires.

The Commission and the company urge before us two grounds for excepting the instant case from the *Sierra-Mobile* doctrine, both turning on the fact that a prior, unappealed order of the Commission[3] had declined to accept the fixed-rate contract involved in this case: (1) It is contended that the *Sierra-Mobile* doctrine applies only to contracts previously accepted as lawful by the Commission. (2) It is contended that the prior "rejection" of the contract is

---

* Chief Judge Bazelon was a member of the panel which heard argument in these cases, but he later withdrew from participation in their consideration. Circuit Judge McGowan, Chief Judge Bazelon's replacement, has considered the cases on the briefs and tape recordings.

** Of the United States District Court for the District of Massachusetts, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. Order Suspending Proposed Rate Schedule, Providing for Hearing, Denying Motion to Reject, Granting Motion to Require Filing of Contract and Permitting Intervention, issued November 22, 1972 (hereinafter the November 22 order); Order Denying Rehearing and Amending Prior Order, issued January 4, 1973 (hereinafter the January 4 order). These orders are in Docket No. E–7795. Lansdale additionally challenges Order Accepting for Filing and Suspending Tendered Filing, Consolidating Proceedings Providing for Hearing, and Requiring Submission of Updated Cost Data, issued March 19, 1973, originally Docket No. E–7789 but later consolidated with Docket E–7795 (hereinafter

the March 19 order). The March 19 order was affirmed on rehearing, May 14, 1973. Lansdale has exhausted its administrative remedies in timely fashion so as to secure judicial review of each of these orders in this court pursuant to 16 U.S.C. § 825*l*(b) (1970).

2. A fixed-rate contract establishes a particular price for electric power. A contract might instead leave the price term open, thus allowing the public utility company to establish whatever rate it wishes, subject to FPC supervision. Or the contract might provide for rates to escalate in a particular manner from time to time. On the important difference between the latter type of contract and a fixed-rate contract, see Episcopal Theological Seminary v. FPC, 106 U.S.App.D.C. 37, 269 F.2d 228, cert. denied, 361 U.S. 895, 80 S.Ct. 197, 4 L.Ed.2d 151 (1959).

3. Order Rejecting Proposed Rate Agreement, issued August 31, 1972, Docket No. E–7726 (hereinafter the August 31 order). As no party sought rehearing of that order within 30 days of its issuance, judicial review is statutorily foreclosed. 16 U.S.C. § 825*l*.

*res judicata,* precluding Lansdale from raising the contract as an objection to the company's filed rate increase. We have concluded that the first argument misstates the law and that the second misconstrues the prior order. Accordingly, we in part modify, and otherwise set aside, the orders under review.

## I. THE PROCEEDINGS

### A. *The 1971 Contract and the Unappealed Order of August 31, 1972*

From 1956 to 1964 Lansdale generated most of its own power but purchased some electricity from Philadelphia Electric. On March 20, 1964 the Borough and the company signed a fixed-rate contract, subsequently accepted for filing by the Commission, for a monthly supply of not more than 8,000 kilowatts of electric power; the agreement was for a term of three years, and year-to-year thereafter. In 1967 the Borough began to investigate the terms and conditions on which various utility companies, including Philadelphia Electric, would supply all of the Borough's electricity needs. These explorations culminated on November 12, 1971 in a new agreement between Lansdale and Philadelphia Electric. This contract superseded the 1964 agreement and promised the Borough a monthly electric supply of 29,000 kilowatts for a five-year period "in accordance with the terms hereof, including the rate schedule attached hereto and made a part hereof." The attached schedule prescribed fixed rates identical with those set in the 1964 contract. The 1971 agreement incorporated a separate contract, signed the same day, obligating Lansdale to build certain new facilities to carry the increased power supplies from the company.

By a letter dated December 27, 1971, Philadelphia Electric sent the new contract to the FPC, attaching the facilities agreement as an appendix.[4] Noting that the new contract superseded the 1964 agreement and that the 1964 rates were continued unchanged under the new contract, the letter asked the Commission to "permit this new agreement to become effective November 12, 1971 [so that] * * * the changes in present facilities can proceed without delay."[5] The Commission deferred docketing and awaited "comments from Philadelphia with respect to the prematurity of such filing."[6] (Apparently the Commission thought filing should ·not precede by more than 90 days the point when monthly service to Lansdale was to exceed the 8,000 kilowatts specified in the 1964 contract.[7]) Meanwhile, pursuant to the 1971 facilities agreement Lansdale proceeded with the construction necessary to carry the additional service, completing this on July 26, 1972 at a cost of about $350,000 to the Borough.[8]

While Lansdale was laboring to fulfill its obligations under the 1971 agreements, Philadelphia Electric apparently decided to breach the agreements. Without notice to the Borough, the company withdrew from the Commission the letter filing of the agreements and, on May 1, 1972, the company proffered a new filing which proposed rates substantially higher than those set in the 1971 contract.[9] Lansdale asked the

---

4. The letter apparently reached the FPC on January 7, 1972. *See* the August 31 order, *supra* note 3, at 1. The letter is reprinted as Appendix A to petitioner's brief.

5. Letter, *supra* note 4, at 2.

6. The August 31 order, *supra* note 3, at 1 n. 1.

7. The Commission stated that the 1971 contract "by its terms * * * was not to become effective until initiation of the increased service to Lansdale." *Id.* The 90-

day regulation, at 18 C.F.R. § 35.3(b) (1973), provides an escape hatch:

The Commission, upon request and for good cause shown, may permit a rate schedule or part thereof to be tendered for filing and posted more than 90 days before it is to become effective.

But Philadelphia Electric never bothered to invoke this provision.

8. Brief for petitioner at 3.

9. The May 1 filing is reprinted in the Joint Appendix at 10–23. Rates were to increase about 41% over the levels set in the 1971

Commission to reject the new filing summarily as a unilateral attempt to abrogate the 1971 contract in violation of the *Sierra-Mobile* doctrine. Philadelphia Electric answered that it would suffer a loss on its service to Lansdale under the 1971 contract and that parol evidence would show that the Borough had understood that the 1971 contract rates could be altered unilaterally.

On August 31, 1972 the Commission issued an "Order Rejecting Proposed Rate Agreement" which was appealed by neither party and is no longer subject to judicial review.[10] The order found that the 1971 contract unambiguously prescribed fixed rates for electric service so that "there is no need to consider the parol evidence advanced by Philadelphia nor to invoke the parol evidence rule."[11] The order also granted Lansdale's motion to reject summarily the proposed rate increases on *Sierra-Mobile* grounds:

> The Commission * * * concludes that Philadelphia's proposed increase in rates to Lansdale is in violation of the principle enunicated [*sic*] by the United States Supreme Court in F.P.C. v. Sierra Pacific Power Company, 350 U.S. 348 [76 S.Ct. 368, 100 L.Ed. 388] (1956) and in United Gas Pipe Line Company v. Mobile Gas Service Corporation, 350 U.S. 332 [76 S.Ct. 373, 100 L.Ed. 373] (1956) and should accordingly be rejected. The *Sierra-Mobile* rule provides that a public utility cannot file a unilateral change in rates under a "fixed rate" contract with a customer.[12]

But the Commission expressed discontent with the rule:

We recognize that we are bound by the current state of the law as interpreted in *Mobile, Sierra* and *Memphis* [United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div., 358 U.S. 103 [79 S.Ct. 194, 3 L.Ed.2d 153] (1958)] and we will continue to be governed by the principles set forth therein. However, it is our intention in future cases involving new fixed rate contracts to scrutinize the provisions of each such contract in order to determine whether it is in the public interest.[13]

Several paragraphs later, without further explanation, the Commission stated:

> In rejecting the proposed change in rate schedule for service to Lansdale we shall not accept the agreement providing for full requirements service to Lansdale by Philadelphia.[14]

In summarizing its order the Commission stated that the company's filed rate increase was "rejected and not allowed to become effective," and that "Philadelphia's agreement with Lansdale for full requirements service is not allowed to become effective.[15]

### B. *The Orders Under Review*

The August 31, 1972 order left the 1964 contract as the only document physically on file with the Commission covering the company's service to Lansdale. But that contract provided for only 8,000 kilowatts per month, and service in excess of 8,000 kilowatts began September 1, 1972[16] and has contin-

---

contract. The May 1 filing consisted of a package in three parts: the 1971 fixed-rate contract, the 1971 facilities agreement (denoted an appendix), and "Supplement 1" to the 1971 rate contract. This "Supplement 1," to which Lansdale had not consented, contained the rate increase along with other, now immaterial, changes in the 1971 contract. The supplement purported to supersede particular pages of the 1971 contract. This effort was, however, somewhat confused for one page of the supplement sought to supersede an "Original Page No. 5" of the 1971 contract, while that contract in fact had only four pages. It was there-

fore somewhat difficult, though not impossible, to distinguish the rate increase supplement from the original provisions of the 1971 contract.

10. *See* note 3 *supra*.

11. The August 31 order, *supra* note 3, at 4.

12. *Id.* at 2.

13. *Id.* at 4.

14. *Id.* at 5.

15. *Id.*

16. The January 4 order, *supra* note 1, at 5.

ued since, as the 1971 contract contemplated. On October 24, 1972 the company submitted a new filing which assumed that the 1971 contract rates were a dead letter.[17] The filing provided that the 1964 contract govern service up to 8,000 kilowatts per month until March 23, 1973.[18] For service in excess of 8,000 kilowatts, and for all service after March 1973, substantially higher rates were proposed.[19] The Borough asked that the Commission summarily reject the new filing as inconsistent with the 1971 contract and that the Commission direct the company to file that contract instead.

On November 22, 1972, in the first order challenged here,[20] the Commission denied Lansdale's motion to reject the filing summarily. Instead the Commission suspended the company's filing until November 25 and set a hearing on the "lawfulness" of both the "proposed rate schedule tendered for filing by Philadelphia" and "the provisions of the aforesaid November 12, 1971, contract."[21]

17. The filed tariff, entitled "Wholesale Municipal Service Rate Schedule" and subsequently designated FPC No. 38, is reprinted at JA 33–38a. This filing did not contain the 1971 agreements. A letter from Philadelphia Electric accompanying the filing did, however, refer to the agreements by stating that the August 31 order had "rejected" them. That letter is reprinted at JA 29–32.

18. At this date the 1964 agreement—which had been a year-to-year contract since 1967—would have expired by its own terms had not the 1971 contract already entirely superseded it.

19. The rates were designed to provide Philadelphia Electric with the same rate of return on service to Lansdale—about 2.3%—as would have resulted from the "Supplement 1" rates filed on May 1, 1972 and rejected by the August 31 order, *supra* note 3. *See* letter from the company to the Commission mentioned in note 17 *supra*, JA at 31.

20. The November 22 order, *supra* note 1.

21. *Id.* at 3.

22. *Id.* at 2–3.

23. The January 4 order, *supra* note 1. This order also vacated a December 11, 1972 "Order Correcting and Amending Prior Order." This December 11 order is further evidence of the Commission's befuddlement throughout these complex proceedings. The

The Commission rejected Lansdale's demand that Philadelphia be ordered to file the 1971 contract rates:

> [W]e indicated in our order of August 31, 1972, in which we rejected that contract, that it is our intention in future cases involving new fixed rate contracts to scrutinize the provisions of each contract in order to determine whether it is in the public interest. It is stated in the filing that Lansdale has required service substantially in excess of 8,000 kw demand * * *. * * * Under these circumstances we believe it is appropriate to require Philadelphia to submit the November 12, 1971, contract to the Commission in order for us to determine whether such contract is in the public interest in light of the circumstances of this case.[22]

Lansdale applied for a rehearing, which application was rejected by the Commission's order of January 4, 1973, the second order under review here.[23]

December 11 order became necessary because the November 22 order had created a seeming paradox. It had directed the company to "submit" to the Commission the 1971 contract "to become effective on November 25, 1972." The November 22 order, *supra* note 1, at 4. Furthermore, the Commission had entitled the November 22 order in part as "Granting Motion to Require *Filing* of Contract * * *." (Emphasis added.) Consequently, the November 22 order appeared to make the 1971 contract rates effective as of November 25, 1972— while simultaneously making the October 24 rate increase also effective as of that date. This was an obvious impossibility. The December 11 order sought to meet this dilemma. It stated that the 1971 contract was to be submitted only as *evidence* bearing on the lawfulness of the October 24 rate increase; the January 4 order would, however, eventually decide that the contract was not material evidence on this issue. The December 11 order went on to elaborate a view as to the "effective" date of the contract, stating that the document "by its own terms became effective on November 12, 1971." This statement conflicted with the Commission's determination, announced in the August 31 order, that the 1971 contract, "by its own terms," "was not to become effective until initiation of the increased service to Lansdale" (*i. e.*, September 1, 1972). *See* note 7 *supra*.

The Commission reasserted that Philadelphia Electric's October 24 rate schedule was accepted as effective pending a hearing on its lawfulness.[24] But the order had new things to say about the 1971 contract. The document was now termed "the alleged fixed rate contract."[25] The contract was declared "presumptively not in the public interest."[26] Consequently, the Commission decided that "[s]ubmission of such contract is not material to our disposition of the pleadings before us."[27]

## II. THE ISSUES

### A. *The Sierra-Mobile Doctrine*

The FPC very much dislikes the *Sierra-Mobile* doctrine[28] but, knowing that this court cannot change it, the Commission asks only that we find the instant controversy to lie outside the boundaries of the doctrine. The asserted grounds for such a finding are examined in the next section. But our inquiry must begin with the doctrine itself.

*FPC* v. *Sierra Pacific Power Co.*, *supra*, and *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp.*, *supra*, deal respectively with parallel provisions of the Federal Power[29] and Natural Gas[30] Acts and explore the relationship between fixed-rate contracts and FPC regulation in formation of public utility rates. The statutory framework is quickly sketched. Public utilities must file with the Commission all rates charged to, and contracts made with, their customers.[31] Filing is merely to give notice; advance Commission approval is not necessary for new and changed rates,[32] and summary rejection of a filing is proper only when the filing is patently unlawful.[33] But the Commission may reject a filing after a hearing if the new or changed rates are found to be "unjust" or "unreasonable."[34] Pending the hearing,

24. The January 4 order, *supra* note 1, at 5.

25. *Id.* at 4 & 5.

26. *Id.* at 5.

27. *Id.* On January 19, 1973 the company, by yet another filing, asked the Commission to apply its October 24, 1972 rate increase to all Lansdale service (*i. e.*, including the first 8,000 kilowatts per month) effective March 1973. In the March 19 order, *supra* note 1, the Commission suspended this new filing for one day and set a hearing on it; the hearing was consolidated with the one set on the October 24 filing by the November 22 and January 4 orders. In the March 19 order, at 2, the Commission stated that "Lansdale's *Mobile-Sierra* arguments were answered in our order issued January 4, 1973, in Docket No. E–7795 and require no further discussion in this order."

28. *See, e. g.*, the August 31 order, *supra* note 3, at 4; the November 22 order, *supra* note 1, at 2; the January 4 order, *supra* note 1, at 4. *See also* Richmond Power & Light of Richmond, Ind. v. FPC, 156 U.S.App.D.C. 315, 320, 481 F.2d 490, 495 (1973); Carolina Power & Light Co., 47 FPC 1, 4 (1972).

29. Sections 205 and 206 of the Federal Power Act of 1920, ch. 285, as added August 26, 1935, ch. 687, Title II, § 213, 49 Stat. 851 & 852, 16 U.S.C. §§ 824d & 824e (1970).

30. Sections 4 and 5 of the Natural Gas Act of 1938, ch. 556, 52 Stat. 822 & 823, 15 U.S.C. §§ 717c & 717d (1970).

31. Section 205(c) & (d) of the Federal Power Act, 16 U.S.C. § 824d(c) & (d); §§ 4(c) and 4(d) of the Natural Gas Act, 15 U.S.C. § 717c(c) & (d).

32. United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 342, 76 S.Ct. 373, 100 L.Ed. 373 (1956).

33. Commission regulations authorize summary rejection of "any material submitted for filing with the Commission which patently fails to substantially comply with the applicable requirements set forth in this part, or the Commission's rules of practice and procedure." 18 C.F.R. § 35.5. We have upheld this provision as being within the Commission's statutory powers. Municipal Light Boards of Reading & Wakefield, Mass. v. FPC, 146 U.S.App.D.C. 294, 299, 450 F.2d 1341, 1346 (1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972). Summary rejection "classically is used not to dispose of a matter on the merits but rather as a technique for calling on the filing party to put its papers in proper form and order." *Id.* But "[i]t may be used by an agency where the filing is so patently a nullity as a matter of substantive law, that administrative efficiency and justice are furthered by obviating any docket at the threshold rather than opening a futile docket." *Id.*

34. Section 205(e) of the Federal Power Act, 16 U.S.C. § 824d(e); § 4(e) of the Natural Gas Act, 15 U.S.C. § 717c(e).

the Commission may summarily "suspend" the filing for up to five months, and if there has been a suspension, of even one day, the Commission may order refunds to customers of a rate increase subsequently found to be unlawful.[35] Even where a rate is in effect, it remains subject to prospective alteration, by the Commission if, after a hearing, the rate is shown to be "unjust, unreasonable, unduly discriminatory, or preferential."[36] In *Sierra Pacific* and *United-Mobile*, public utility companies filed rate increases inconsistent with fixed-rate contracts, between the companies and their customers, which had previously been filed with, and deemed effective by, the Commission. In both cases the customers demanded that the Commission reject the filed increases summarily.

In *United-Mobile* the Commission refused even to suspend the rate increase, and deemed it effective. The aggrieved customer paid the new rates but brought a contract action against the filing company. Ruling for the customer, the Supreme Court held that a public utility's statutory *duty* to file a rate increase before charging it to customers does not create a *power* in the utility company to alter contract rates unilaterally.

 \* \* \* The initial rate-making and rate-changing powers of natural gas companies remain undefined and unaffected by the Act.

 \* \* \* The obvious implication is that, except as specifically limited by the Act, the rate-making powers of natural gas companies were to be no different from those they would possess in the absence of the Act: to establish *ex parte*, and change at will, the rates offered to prospective cus-

tomers; or to fix by contract, and change only by mutual agreement, the rate agreed upon with a particular customer. \* \* \*[37]

The Court stated that the Commission should have summarily rejected the filed rate increase.[38]

In *Sierra Pacific* the Commission suspended the rate increase pending a hearing, but the hearing determined the increase to be lawful and it went into effect. The Court reversed the Commission, holding that neither the filing of the increase nor the subsequent acceptance of it by the Commission was "effective to supersede [the] contract."[39] The Court recognized a power in the Commission to increase utility rates contrary to an outstanding contract between the utility company and its customers, but stated that this power could be exercised only if, and after, a hearing had shown the contract rates to violate the "public interest."[40] The hearing conducted in *Sierra Pacific* had determined the prevailing contract rates to be unlawful simply because they afforded the utility company a very low rate of return. This, said the Court, was not enough to invalidate the contract rates:

[W]hile it may be that the Commission may not normally *impose* upon a public utility a rate which would produce less than a fair return, it does not follow that the public utility may not itself agree by contract to a rate affording less than a fair return or that, if it does so, it is entitled to be relieved of its improvident bargain. \* \* \* In such circumstances the sole concern of the Commission would seem to be whether the rate is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to

35. *Id.*

36. Section 206(a) of the Federal Power Act, 16 U.S.C. § 824e(a) ; § 5(a) of the Natural Gas Act,15 U.S.C. § 717d(a).

37. United Gas Pipe Line Co. v. Mobile Gas Service Corp., *supra* note 32, 350 U.S. at 343, 76 S.Ct. at 380.

38. *Id.* at 347, 76 S.Ct. 373.

39. FPC v. Sierra Pacific Power Co., 350 U. S. 348, 352–353, 76 S.Ct. 368, 100 L.Ed. 388 (1956).

40. *Id.* at 353–355, 76 S.Ct. 368.

continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory. \* \* \* [I]t is clear that a contract may not be said to be either "unjust" or "unreasonable" simply because it is unprofitable to the public utility.[41]

B. *The Asserted Differences Between This Case and the* Sierra-Mobile *Proceedings*

There are striking similarities between the present case and the discredited FPC proceedings in *Sierra Pacific* and *United-Mobile.* In its October 24, 1972 rate filing, Philadelphia Electric sought to convert its statutory duty to file into a vehicle for breaching the 1971 contract with Lansdale. By conditionally accepting the filing, in the order of November 22, 1972, the Commission overrode the 1971 contract rates, before holding an evidentiary hearing on whether the contract rates contravened the public interest. Indeed, by declaring the 1971 contract to be "immaterial" and "presumptively not in the public interest," the Commission decided in its order of January 4, 1973 never to hold such a hearing. The only hearing scheduled is identical in form and purpose to the one found inadequate in *Sierra Pacific, i. e.,* a hearing on the "reasonableness" of the filed rate increase.

Yet the Commission and Philadelphia Electric contend that, for two reasons, the *Sierra-Mobile* doctrine does not apply here. (1) In *Sierra Pacific* and *United-Mobile* the attempted rate increase violated fixed-rate contracts which the Commission had long before accepted for filing and declared effective for regulatory purposes. The Commission has never accepted or declared effective the 1971 contract between Lansdale and Philadelphia Electric. The

Commission argues that the *Sierra-Mobile* doctrine has no application to "new" contracts not yet on file with the Commission. (2) The Commission argues that its now final order of August 31, 1972 not only declined to accept filing of the 1971 contract at the time but definitively *rejected* the contract on its merits for all time and for all regulatory purposes. This rejection is, according to the Commission, *res judicata* and thus immune to collateral attack in the instant proceedings.

We are persuaded by neither of these arguments.

1. *The "New" Contract Distinction*

The Commission and Philadelphia Electric argue that, if a fixed-rate contract is not yet filed with the FPC, the Commission and the public utility which signed the contract may ignore the document and proceed, respectively, to file rates and to accept their filing as if the contract had never been negotiated. This theory has two hidden, but necessary, corollaries: The company need not file a new contract, and the Commission need not order the company to do so. These are preposterous notions.

The Third Circuit has given appropriately short shrift to the Commission's theory.

> The fact that the Mobile case dealt with an attempt to supersede an already filed rate and that the instant case is concerned with the filing of an initial rate is an immaterial difference.

Natural Gas Pipeline Co. v. FPC, 3 Cir., 253 F.2d 3, 7, cert. denied, 357 U.S. 927, 78 S.Ct. 1372, 2 L.Ed.2d 1370 (1958). Holding otherwise would, in practical effect, amount to overruling *Sierra Pacific* and *United-Mobile* prospectively. The

---

41. *Id.* at 355, 76 S.Ct. at 372 (emphasis in original). The Supreme Court has recently reaffirmed these principles:

> The regulatory system created by the [Natural Gas] Act is premised on contractual agreements voluntarily devised by the regulated companies; it contemplates

> abrogation of these agreements only in circumstances of unequivocal public necessity. \* \* \*

Permian Basin Area Rate Cases, 390 U.S. 747, 822, 88 S.Ct. 1344, 1389, 20 L.Ed.2d 312 (1968).

Supreme Court thought of these decisions as "preserving the integrity of contracts" so as to "permit[] the stability of supply arrangements" and to encourage the "substantial investments which the consumer would be unwilling to make without long-term commitments." United Gas Pipe Line Co. v. Mobile Gas Service Corp., *supra*, 350 U.S. at 344, 76 S.Ct. at 380. But, if the Commission's theory were accepted, no electric power consumer could place the slightest reliance on any fixed-rate agreement it might negotiate in the future.

The gist of the Commission's theory is that a fixed-rate contract has no binding force, at least for regulatory purposes, until it is physically filed with, and accepted by, the Commission. This stands the *Sierra-Mobile* doctrine on its head, for it is the purpose of that doctrine to subordinate the statutory filing mechanism to the broad and familiar dictates of contract law.

> The rule * * * is refreshingly simple: The contract between the parties governs the legality of the filing. Rate filings consistent with contractual obligations are valid; rate filings inconsistent with contractual obligations are invalid. * * *

Richmond Power & Light of Richmond, Ind. v. FPC, 156 U.S.App.D.C. 315, 318, 481 F.2d 490, 493 (1973). Contracts govern the legality of filings not because the contracts may themselves have been previously filed but because the regulatory statutes permit

> the relations between the parties to be established initially by contract, the protection of the public interest being afforded by supervision of the individual contracts, which to that end must be filed with the Commission and made public.

United Gas Pipe Line Co. v. Mobile Gas Service Corp., *supra*, 350 U.S. at 339, 76 S.Ct. at 378.

A public utility company has a statutory obligation to file any new or altered contract which it has negotiated. 16 U.S.C. § 824d(c) & (d). This obligation does not vanish merely because the company, or indeed the Commission, decides the contract affords the company too low a rate of return. Breach of the filing obligation gains the company nothing, for rates established in a fixed-rate contract become effective for regulatory purposes even if the company bound by the contract neglects to file it.

> The failure to file [a rate contract] earlier, however, did not prevent the jurisdiction of the Commission from attaching. * * * [U]nder the rationale of United Gas Pipe Line Co. v. Mobile Gas Corp., supra, the contract rate, even though unfiled, became and remained the only lawful rate until changed by order of the Federal Power Commission. * * *

Natural Gas Pipeline Co. of America v. Harrington, 5 Cir., 246 F.2d 915, 919 (1957), cert. denied, 356 U.S. 957, 78 S. Ct. 992, 2 L.Ed.2d 1065 (1958). *See also* Plaquemines Oil & Gas Co. v. FPC, 146 U.S.App.D.C. 287, 450 F.2d 1334 (1971); City of Colton v. So. Cal. Edison Co., 26 FPC 223 (1961), order set aside, 9 Cir., 310 F.2d 784 (1962), 9th Cir. reversed, 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964). The Commission's own regulations recognize that new and unfiled contracts govern the legality of rate filings subject to the terms of the contracts. A public utility company filing either a new or an altered rate schedule must "show that all requisite agreement to the rate schedule or the filing thereof, including any contract embodied therein, has in fact been obtained." 18 C.F.R. §§ 35.12(a) & 35.-13(a) (1973). Settled law holds administrative agencies to compliance with their own regulations.[42]

42. Service v. Dulles, 354 U.S. 363, 372–373, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); Bonita, Inc. v. Wirtz, 125 U.S.App. D.C. 163, 167, 369 F.2d 208, 212 (1966);

■■ Thus the present case does not fall outside the confines of the *Sierra-Mobile* doctrine merely because the 1971 contract has never been filed with, or accepted by, the Commission. Just as the regulatory force of a contract survives the filing, and summary Commission acceptance, of rates inconsistent with the document, so also the regulatory force of a contract arises before, and survives in the absence of, the physical filing of the document with the Commission. The Commission must summarily reject rate filings inconsistent with outstanding fixed-rate contracts whether or not the contracts have been filed with the Commission.[43]

### 2. The "Res Judicata" Argument

■ The August 31, 1972 order, no longer open to judicial review, contained these two statements:

> Elmo Division of Drive-X Co. v. Dixon, 121 U.S.App.D.C. 113, 117, 348 F.2d 342, 346 (1965); Sangamon Valley Television Corp. v. United States, 106 U.S.App.D.C. 30, 33, 269 F.2d 221, 224 (1959).

43. This is not to deny that the Commission may suspend, and hold a § 205(e) hearing on the filing of, a fixed-rate contract. Under the Federal Power Act the Commission may suspend, and hold a hearing on the justness and reasonableness of, any "new schedule" filed with the Commission. Section 205(e), 16 U.S.C. § 824d(e). The term "new schedule" refers to a schedule stating "[a] change or changes to be made in the schedule or schedules then in force." Section 205(d), 16 U.S.C. § 824d(d). Such "new schedules" must be filed by a public utility to effect a "change * * * in any * * * rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto." *Id.* If a rate filing effects an increase in rates already on file with the Commission, "the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility." Section 205(e), 16 U.S.C. § 824d(e). But § 205(e) provides no means for a public utility or the Commission to circumvent the *Sierra-Mobile* doctrine. That doctrine broadly holds that the Commission cannot order an increase in rates set in a fixed-rate contract, or reject the rates on grounds they are too low, unless and until a hearing has shown the rates to be lower than the public interest requires. This doc-

> In rejecting the proposed change in rate schedule for service to Lansdale we shall not accept the agreement providing for full requirements service to Lansdale by Philadelphia.
>
> \* \* \* \* \* \*
>
> Philadelphia's agreement with Lansdale for full requirements service is not allowed to become effective.[44]

Counsel for the Commission and the company construe this language as a definitive rejection of the 1971 contract rates for all time and for all regulatory purposes, and argue that such a definitive rejection is not subject to collateral attack in the present proceeding. As we construe the order's language differently, we need not decide whether the essentially judicial concepts of *res judicata* should be applied to FPC "rejections" of rate filings.[45]

trine applies as fully to a § 205(e) hearing as to a § 206(a) hearing.

44. The August 31 order, *supra* note 3, at 5.

45. The Federal Power Act does not lay down any rules of *res judicata* or collateral estoppel. The provision relied upon by the Commission and the company, § 313 of the Act, 16 U.S.C. § 825l, does not deal with *res judicata* but with timely exhaustion of administrative remedies as a prerequisite to securing judicial review of a Commission order. The provision would be pertinent here if Lansdale were asking this court to set aside or modify the August 31 order itself. But the issue is a different one, *viz.* whether the August 31 order precludes the Borough from petitioning the Commission at a later date to recognize the contract prospectively and order its filing.

This court has noted that conventional *res judicata* doctrines are not always applicable in the administrative realm. Niagara Mohawk Power Corp. v. FPC, 91 U.S.App.D.C. 395, 402, 202 F.2d 190, 197 (1952), affirmed on other grounds, 347 U.S. 239, 74 S.Ct. 487, 98 L.Ed. 666 (1954); Churchill Tabernacle v. FCC, 81 U.S.App.D.C. 411, 413, 160 F.2d 244, 246 (1947). The Supreme Court has suggested that *res judicata* doctrines should apply

[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate.

Apparently Lansdale thought the August 31 order meant only to defer until a subsequent proceeding the question whether the contract was in the public interest and should be accepted. In Lansdale's view, the Commission was merely warning that its rejection of Philadelphia Electric's rate increase did not necessarily entail ultimate acceptance of the 1971 contract; under *Sierra Pacific* that was a question for a full hearing.[46] In the interim the Borough was receiving increased service under the 1971 contract, confident that *United-Mobile* preserved the contract rates unless and until these were qualified in an evidentiary hearing. Under Lansdale's theory the August 31 order is not *res judicata* as to the lawfulness of the 1971 contract under the Federal Power Act because the order did not address that issue but rather put off its resolution to a later date. Without an identity of issues between the two administrative proceedings, *res judicata* doctrines

have no application. *See, e. g.,* FTC v. Motion Picture Advertising Service Co., 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426 (1953); FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656 (1940); Jason v. Summerfield, 94 U.S.App.D.C. 197, 214 F.2d 273, cert. denied, 348 U.S. 840, 75 S.Ct. 48, 99 L.Ed. 662 (1954).

We adopt Lansdale's construction of the August 31 order. That the order is open to divergent interpretations cannot be denied. Indeed, we doubt that the FPC itself knew exactly what it was doing on August 31; throughout these proceedings the Commission's course has been aimless, erratic, and confused. But the ambiguities in the August 31 order are the Commission's responsibility, not Lansdale's, and

[t]he Supreme Court has made reasonably clear that the party asserting collateral estoppel has the burden of showing identity of issues and determination of issues on the merits.

United States v. Utah Construction & Mining Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). Professor Davis has sensibly suggested:

The sound view is * * * to use the doctrine of *res judicata* when the reasons for it are present in full force, to modify it when modification is needed, and to reject it when the reasons against it outweigh those in its favor.

2 K. Davis, Administrative Law Treatise § 18.02 at 548 (1958).

There are three reasons to doubt that summary "rejection" of a rate schedule should preclude refiling and reconsideration of the schedule in a subsequent proceeding. First, the appropriateness of a particular rate schedule typically depends on factual circumstances and policy considerations which change drastically, and often quite rapidly, over time. A doctrine barring all reconsideration would seem to be contrary to sound regulatory policy. Second, the Commission has no authority to reject a rate schedule summarily if the schedule is not improper as a matter of form or "patently a nullity" as a matter of substantive law. *See* note 33 *supra.* Therefore, if the August 31 order "rejected" the 1971 contractual rate schedule, it committed a serious mistake of law. Administrative errors of law are typically open to rectification in subsequent proceedings on the same subject matter and between the same parties. *See generally* 2 K. Davis, *supra,* § 18.03; *cf.* Automobile Club of Michigan v. Com'r of Internal Revenue, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957). Third, as rates can be "rejected" only after a hearing, it is at least arguable that the summary character of the August 31 proceeding "deprive[d] the Commission of power or jurisdiction" so as to render the rejection a nullity, opening it to collateral attack in a subsequent proceeding. *Compare* Public Utility Dist. No. 1 of Douglas County v. FPC, 9 Cir., 242 F.2d 672, 683 (1957), *with* United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 73 S.Ct. 67, 97 L. Ed. 54 (1952).

46. Of course Lansdale's theory does assume that the Commission acted illegally on August 31 for, under the *Sierra-Mobile* doctrine, the FPC had an affirmative duty to accept the 1971 contract for filing pending an evidentiary hearing on whether it comported with the public interest. But the Commission's counsel asks us to impute an even grosser illegality to the Commission, *viz.* that the August 31 order constituted a "permanent" rejection of the 1971 contract on its merits. *See* note 45 *supra.* Where there is ambiguity, we prefer to assume that

2 K. Davis, Administrative Law Treatise § 18.04 at 569 (1958), *citing* United States v. International Building Co., 345 U.S. 502, 73 S.Ct. 807, 97 L.Ed. 1182 (1953).

 Moreover, the available evidence strongly supports the Borough's interpretation of the August 31 order:

1. The order responded to Philadelphia Electric's application to the FPC of May 1, 1972. This application physically contained the 1971 contract, but in a formal sense it "filed" *not the contractual rates* but a unilaterally formulated increase over the contractual rates.[47] Arguably, the August 31 order declined to accept the contractual schedule simply because—as a matter of form—the schedule was not properly before the Commission.[48] A defect of form is by far the most common ground for summary refusal of a rate schedule.[49] Of course such a refusal contemplates a refiling in proper form and is not *res judicata* as to the substantive merits of the filed material.

2. By the actual terms of the August 31 order, the company's attempted rate increase was "rejected and not allowed to become effective," but the 1971 contract was merely "not allowed to become effective." The word "rejected" was not used with respect to the contract. The order made negative findings regarding the attempted rate increase, but made no findings of any kind regarding the 1971 contract.[50] All of which suggests that

the merits of the contract were yet to be decided.

3. If the August 31 order meant to reject the contractual rate schedule on its merits, the order was internally inconsistent, for it rejected the company's attempted rate increase *on the ground that the increase contravened the contract.*[51]

4. The August 31 order stated:

[I]t is our intention in future cases involving new fixed rate contracts to scrutinize the provisions of each such contract in order to determine whether it is in the public interest.[52]

Whether this ambiguous statement means that the 1971 contract would eventually receive this scrutiny, or that only contracts arising for the first time "in future cases" would do so, the statement does clearly imply that the Commission had not *yet* scrutinized the 1971 contract.

5. The November 22 order required the company to submit the 1971 contract to the Commission "in order for us to determine whether such contract is in the public interest in light of the circumstances of this case."[53] This would make no sense if the August 31 order had already found the contract to be unlawful.[54]

6. Several important statements in the January 4 order make clear that—in the Commission's own view—the August 31 order did not preclude Philadelphia

---

the Commission temporarily neglected an affirmative duty rather than that it willfully and irrevocably committed itself to an unlawful course.

47. *See* note 9 *supra.*

48. *But see* note 46 *supra.*

49. *See* note 33 *supra.*

50. The August 31 order, *supra* note 3, at 39.

51. Counsel for the FPC argues that the August 31 order rejected the company's May 1 rate increase on *Sierra-Mobile* grounds only because the increase was inconsistent with the *1964 fixed-rate contract* already on file

with the FPC. This is an astonishing argument. The August 31 order makes no mention of the 1964 contract.

52. The August 31 order, *supra* note 3, at 4.

53. The November 22 order, *supra* note 1, at 3.

54. An alternative interpretation is possible but it does not advance the Commission's *res judicata* theory. Perhaps the phrase quoted in text means the Commission thought its August 31 order had definitively rejected the 1971 contract but that provision of increased service to Lansdale after that order—*i. e.,* "the circumstances of this case"

Electric from filing the 1971 contract, and that definitive rejection of the contract did not occur until the January 4 order:

> Consistent with our expressed intent in future cases to scrutinize the provisions of new fixed rate contracts in order to determine whether they are in the public interest we *herein* find that the alleged fixed rate contract of November 12, 1971, is presumptively not in the public interest. \* \* \* *Philadelphia's refusal in the instant proceeding to file the November 12, 1971, contract* and Lansdale's characterization of that instrument as a fixed rate contract subject to the *Mobile-Sierra* rule satisfies us that it is not in the public interest to require Philadelphia to tender that contract for filing.[55]

In sum, by theorizing that the August 31 order is *res judicata* as to the merits of the 1971 contract, counsel for the FPC and the company not only misconstrue the August 31 order; they also advance a rationale for the November 22 and January 4 orders which the Commission itself did not adopt at the time. "The courts may not accept appellate counsel's *post hoc* rationalizations for agency action." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

### III. DISPOSITION

The orders under review violated the principles established by *Sierra Pacific* and *United-Mobile*. The Commission erroneously refused to reject summarily the company's October 24, 1972 rate increase, which filing was inconsistent with the outstanding 1971 contract. The Commission erroneously denied Lansdale's motion that the company be ordered to file the 1971 contract. The Commission erred in finding the 1971 contract unlawful without conducting an evidentiary hearing on the issue. And the Commission erred in setting a hearing on the company's rate increases rather than on the lawfulness of the 1971 contract.

Though this fixed-rate contract has not been on file with the Commission, the Commission has been powerless to disturb the contractual rates, and remains so until an evidentiary hearing shows them to be so low as to contravene the public interest. Filed or not, this contract has been within the Commission's jurisdiction from the moment it became effective by its own terms. The company had and has a statutory duty to file the contract, which duty the Commission was and is obligated to enforce.

Consequently, the orders under review are modified to the extent that Philadelphia Electric is directed to file the 1971 contract with the Commission forthwith; in all other respects the orders are vacated. We direct the Commission to dismiss all proceedings commenced pursuant to the vacated orders. The 1971 contract rates are currently effective. The Commission may at any time in the future conduct a Section 206(a) hearing on whether those contract rates failed to conform with the public interest. *See* FPC v. Sierra Pacific Power Co., *supra*, 350 U.S. at 353, 76 S.Ct. 368.

So ordered.

---

—required a fresh determination of the 1971 contract's acceptability. If the Commission purports to reopen an issue in this fashion, and to decide it anew, judicial review of the new decision cannot be cut off on the ground that the new decision is consistent with the old one. *See* Natural Gas Pipeline Co. v. FPC, 3 Cir., 253 F.2d 3, 9, cert. denied, 357 U.S. 927, 78 S.Ct. 1372, 2 L.Ed.2d 1370 (1958).

55. The January 4 order, *supra* note 1, at 4–5 (emphasis added).